**Billy Joe HIGBEE, a Resident of the State of Arkansas, Plaintiff,**

v.

**Joe Fred STARR d/b/a Poultry Growers, Inc. and/or Bi-State Energy, Inc.; Tyson Foods, Inc., An Arkansas Corporation; George Harmon, a resident of the State of Arkansas, Defendants.**

No. 82–5072.

United States District Court, E.D. Arkansas, Fayetteville Division.

Dec. 4, 1984.

See also 8 Cir., 698 F.2d 945.

John Arens, Fayetteville, Ark., for plaintiff.

James M. Roy, Jr., Michael H. Mashburn, Cypert & Roy, and James B. Blair, Springdale, Ark., for defendants.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

Suit was filed on April 27, 1982, by plaintiff Billy Joe Higbee against defendants Joe Fred Starr d/b/a Poultry Growers, Inc. and/or Bi-State Energy, Inc. (hereafter "Starr"); Tyson Foods, Inc.; and George Harmon. Mary Ruth Sallee was later added as a party defendant. Jurisdiction is predicated on 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a), with pendent jurisdiction over related state-law claims. Higbee alleged the following causes of action: 1) Discharge of pollutants into navigable waters of the United States without a permit, in violation of 33 U.S.C. § 1311(a); 2) violation of permit conditions set forth in permits issued by the Arkansas State Department of Pollution Control and Ecology, in violation of 33 U.S.C. § 1342; 3) battery (offensive touching by pollutants); 4) trespass (intrusion by pollutants); 5) negligence; 6) nuisance; 7) intentional infliction of emotional distress; 8) interference with contract; and 9) retaliatory eviction. Civil penalties and injunctive relief were requested.

Higbee's claims for retaliatory eviction and interference with contract were based upon her allegations that her rental agreement with Sallee was interfered with by some or all of the defendants herein, in retaliation for her having instituted this lawsuit. On March 11, 1982, Sallee sued Higbee for unlawful detainer in Washington County Circuit Court, Civil Action number 82–228. That case was heard on the merits on July 19, 1982, and a final order issued by the Honorable Maupin Cummins in which it was found that Hig-

bee was in default on rental payments and Sallee was entitled to possession of the property. No appeal was taken by Higbee from that final determination. This Court found that the state court conclusively adjudicated all issues regarding the propriety of Higbee's eviction from the Sallee property against Higbee, and granted summary judgment in favor of defendants on the claim of retaliatory eviction. At the trial of this matter on September 20, 1984, Higbee put on no evidence directly related to her claims of interference with contract, battery, or intentional infliction of emotional distress. Therefore, this Court finds that those counts were abandoned by Higbee.

The operation which Higbee alleged was causing pollution consists of 10 hog finishing houses with a capacity of 350–400 hogs per house. Young hogs are housed there, and fed out to slaughter weight. Waste produced by the hogs falls through the slats in the floors of the houses, and is collected in holding basins, each of which will hold approximately 70,000 gallons of wastewater. These basins are periodically pumped out, and the accumulated liquid, known as "honey" or hog litter, is then spread on pastureland for fertilizer. The hog finishing operation is known as the Low Gap Hog Farm.

When the abandoned or previously decided causes of action are extracted from the pleadings, this lawsuit boils down to one issue: whether Starr, Tyson, and Harmon, separately or in concert, operated the Low Gap Hog Farm in such a manner as to violate the provisions of the Clean Water Act, 33 U.S.C. § 1251, et seq. The Low Gap Hog Farm is a "concentrated animal feeding operation," as defined by 40 C.F.R. § 122.23 (App. B). The hog farm is located near the top of a hill, at the base of which is located the property owned by defendant Mary Ruth Sallee. At the time suit was filed, Higbee rented a small house and yard on the Sallee property, where she lived with her three children and a rather large collection of domestic animals. Higbee alleged that substandard practices on the Low Gap Hog Farm were causing pollution

of the water sources at her residence, and in navigable waters of the United States. The practices complained of were: 1) construction of the hog houses according to plans and specifications which were not approved by and did not meet the standards of the Arkansas Department of Pollution Control and Ecology; 2) negligence in allowing the holding basins which collect hog waste to overflow onto the ground where the waste could be washed away down the hill by rainwater runoff; 3) negligence in spreading the liquid hog waste on pastureland as fertilizer in such a manner that it would be washed away by rainwater runoff; and 4) disposal of dead hogs in "dead pits" without adequate cover or precautions to prevent accumulated water in the pits from percolating or running off down the hill into Higbee's water sources.

Trial was held on September 20, 1984, and the case was taken under advisement. All parties except Sallee have submitted proposed findings of fact and conclusions of law, and the Court has exhaustively reviewed the submissions of the parties and the exhibits of record. The matter being ripe for decision, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Billy Joe Higbee is, and at all times relevant to this lawsuit was, a citizen and resident of Washington County, Arkansas.

2. Joe Fred Starr (Starr) is, and at all times relevant to this action was, a citizen and resident of Washington County, Arkansas.

3. Bi-State Energy, Inc. is a corporation organized and existing under the laws of the State of Arkansas; Joe Fred Starr is the president of Bi-State Energy, and at all times relevant to this suit acted as the agent, servant, employee or officer of Bi-State Energy, Inc.

4. At all times relevant to this lawsuit, Bi-State Energy, Inc. owned and leased to Poultry Growers, Inc. the hog finishing houses at Low Gap Hog Farm.

5. Poultry Growers, Inc. is a wholly-owned subsidiary of Tyson Foods, Inc.

6. Tyson Foods, Inc. is, and at all times relevant to this action was, an Arkansas Corporation with its principal place of business in Washington County, Arkansas.

7. George Harmon is, and at all times relevant to this action was, a citizen and resident of Washington County, Arkansas; he is presently an employee of Tyson Foods, Inc., and was, for a portion of the time relevant to this lawsuit, an employee of Bi-State Energy, Inc. Harmon was employed as resident manager of the Low Gap Hog Farm.

8. Defendant Mary Ruth Sallee is a citizen and resident of Washington County, Arkansas. She is the owner of certain real property, more particularly described as:

10 acres situated in the Southwest quarter (SW¼) of Section 17, Township 14 North, Range 29 West, in Washington County, Arkansas.

9. The Sallee property is located approximately two miles northeast of the town of Brentwood, Washington County, Arkansas. It is situated at the base of a hill below the Low Gap Hog Farm. A small ravine, which conducts the flow of runoff in wet weather, runs downhill from the Low Gap Hog Farm past the Sallee property and into London Creek, thence into the West Fork of the White River. The terrain between the farm and the Sallee property, with the exception of the road and ravine, is covered with a thick growth of vegetation and forestation.

10. Higbee rented a portion of the Sallee property in November, 1978, and resided there until October, 1982, when she was evicted. Higbee and her three children repaired and occupied a dilapidated shack on the property.

11. The Sallee property occupied by Higbee possessed the following sources of water: a shallow, hand-dug well; the ravine or drainage ditch previously described; and a ground-spring which welled up and filled a tiny pond constructed by Higbee and her friends. Of these sources of water, only the spring provided water demonstrably fit for human consumption.

12. Higbee was warned, at the time that she moved onto the Sallee property, that the well behind the house was not fit for use as a source of drinking water. The water in this well was unfit for human consumption long before construction began on the hog houses located on the Low Gap Hog Farm.

13. Higbee utilized the Sallee property not only as living quarters for herself and her family, but also as a shelter for a large brood of domestic animals. She stated in answer to interrogatories that between November, 1978, and July, 1982, she kept approximately 75 dogs, 40 cats, 2 horses, 30 goats, 8 pigs, 400 chickens, 4 peacocks, 130 turkeys, 1 cow, 30 pigeons, 60 rabbits, 35 ducks, and 30 geese. (PX 9.)

14. Higbee prided herself on the fact that she did not keep her animals in pens, but allowed them to have the free run of her yard and of her house. She testified that goats, as well as cats and dogs, urinated and defecated in her house, and the record includes pictures of chickens frolicking among the Christmas packages underneath the tree.

15. With few exceptions, Higbee permitted her animals unrestricted access to drink from, to swim and bathe in, and to foul all of the water sources on her property. She testified that she also drank from these water sources, and that she felt that if the water was clean enough for her "critters" to drink, it was clean enough for her and her family to drink.

16. During the period of time when Higbee, her family, and her animals lived on the Sallee property, the ground surrounding the Higbee home was contaminated by large quantities of animal feces and urine from the animals kept there by Higbee.

17. Higbee maintained two outhouses in the yard of her dwelling on the Sallee property, which were periodically repositioned when the spots in which they were located had become fouled. In order to avoid visit-

ing one or the other outhouse at night, chamber pots were kept in the house. These were emptied each morning on or near the family garden plot, which was located 15–20 feet from the spring.

18. Higbee complained that after the Low Gap Hog Farm commenced operations, her previously pure water supply became polluted and could no longer be used for drinking or bathing. She stated that her house smelled of hog waste, and that her children went to school each day smelling of hogs.

19. The water sources on the Sallee property did not have any unpleasant odor when tested by representatives of the State of Arkansas or by plaintiff's experts. Nor could any hog smell be detected by these experts while standing on the Sallee property. These experts visited the Sallee property some two years after Higbee and her menagerie vacated the property. The Low Gap Hog Farm had been in operation during this entire time.

20. The Low Gap Hog Farm is located in Sections 17, 18, and 19 of Range 29 West, Township 14 North, of Washington County, Arkansas, about 13 miles south southeast of Fayetteville and 1½ miles north northeast of Brentwood in a lightly populated area (PX 2.). It lies ¼ to ½ of a mile above the Sallee property occupied by Higbee from 1978–1982.

21. The Low Gap Hog Farm is a hog finishing operation where hogs are raised to slaughter weight in closed, slatted-floor houses. Waste produced by the hogs falls through the slats in the floor, and is collected in a holding basin. There are 10 houses, with a capacity of 350–400 hogs each. The basins will hold approximately 70,000 gallons of wastewater per house. These basins are periodically pumped out, and the waste, a suspension of solid wastes in water called "honey" or "hog litter," is then spread on pasture land. This litter makes excellent fertilizer. (PX 2.)

22. Defendants have not applied for or obtained a National Pollutant Discharge Elimination System permit from the United States Environmental Protection Agency.

Defendants did, however, obtain from the Arkansas Department of Pollution Control and Ecology a "no discharge" permit for the operation of their waste disposal system at the Low Gap Hog Farm. This permit set out various requirements and conditions for operation of the farm. The "no discharge" status provided that animal waste would be spread on pastureland rather than discharged into waterways.

23. The permit to construct, operate and maintain a waste disposal system at the Low Gap Hog Farm was issued by the Arkansas Department of Pollution Control and Ecology to Bi-State Energy, Inc., on December 3, 1980. The permit provided that it could be modified or revoked "whenever it is necessary, in the opinion of the Department, to prevent or abate pollution of any waters of the State." There has been no modification or revocation of this permit.

24. Bi-State Energy, Inc. had a comprehensive plan for the spreading of the waste from the Low Gap hog houses. This plan took into consideration the seasons appropriate for spreading hog litter, avoided unnecessary concentrations of litter on any one farm or field, provided for lighter application to sloping areas than flat areas to minimize runoff, protected newly-cleared land from over-application to minimize runoff, and was developed in light of requirements specified in the permit by the Arkansas Department of Pollution Control and Ecology and basic conservation practices. (PX 2.)

25. Joe L. Gaston, District Conservationist for the United States Department of Agriculture Soil Conservation Service in Fayetteville, Arkansas, advised Starr on September 12, 1980, to spread waste from the Low Gap Hog Farm on the Low Gap farm and on the C.L. Truelove farm, and designated a third farm adjoining U.S. Highway 71 as a backup spreading location. He stated that "none of the land on these three farms is subject to flooding and run-off will cause a minimum amount of water pollution." (DX 30.)

26. Prior to filing suit, attorneys for Higbee notified the Arkansas Department of Pollution Control and Ecology of alleged problems at the Low Gap Hog Farm. The Arkansas Department of Pollution Control and Ecology investigated these allegations in depth and at length.

27. The report of Jim Rush, Agricultural Permit Inspector for the Arkansas Department of Pollution Control and Ecology, concluded that as of January 28, 1981, the Low Gap Hog Farm was being operated in a manner satisfactory to the Department. (PX 2.)

28. The report of District Field Inspector R. David Orr of the Arkansas Department of Control and Ecology dated February 18, 1981, found that the Low Gap Hog Farm was a "Good operation with adequate amount of pasture suitable for waste disposal." Orr's memorandum submitted with his report stated that "No water pollution was observed that could be attributed to this operation." (PX 2.)

29. On March 19, 1981, Inspector Orr submitted a follow-up report on the Low Gap Hog Farm to plaintiff's attorneys, stating that he had again inspected the farm, paying particular attention to dead animal and waste disposal. He found no problems existing at the farm, either with dead animal disposal or with waste disposal, and stated "I saw nothing which could cause the results you mention (children going to school each morning smelling like hogs)." (PX 2.)

30. Reports by Inspector Orr dated July 29, 1981, and August 17, 1981, found the basic operation of the farm was satisfactory, but stated that lack of cover on the dead hog pits was a serious problem. (PX 2.)

31. During 1980–82, defendants maintained several dead hog disposal pits on the Low Gap Hog Farm. At times there was insufficient cover on the contents of these pits, and the Arkansas Department of Pollution Control and Ecology recommended that a more acceptable alternative for dead hog disposal be developed. In 1982, these pits were replaced by a rendering service which removes dead hogs from the Low Gap Farm Hog Farm on a twice or thrice weekly schedule. (Depo. Harmon, 26–28.)

32. The Arkansas Department of Pollution Control and Ecology continued to make regular inspections at the Low Gap Hog Farm, because of the problem with dead animal disposal. Plaintiff's exhibit 2 contains reports and correspondence dealing with inspections dated February 18, 1982, February 19, 1982, March 1, 1982, and August 30, 1982. On none of these inspections was any problem found concerning the hog houses themselves, or the disposal of waste from the houses. The inspectors consistently concluded that the hog finishing operation at the Low Gap Hog Farm was not a source of water pollution.

33. In a report dated March 18, 1981, Joe L. Gaston, indicated that his soil tests revealed the following: the soil on the Low Gap Farm is Enders stony loam, and the subsoil is red, plastic clay with sandstone over shale. Permeability is very slow. The report concluded that there was little chance of water pollution from the "dead pits" because of the slow permeability of the soil. (PX 2.)

34. Harmon, the resident manager, testified that he lived on the Low Gap Hog Farm, along with his wife and two children. He stated that they had no health problems related to the hog finishing operation.

35. Harmon testified that the holding basins beneath the hog houses are never allowed to overflow, though on occasion they become perilously full and even on a few occasions have "seeped" over the top. When the basins are full, he calls Tyson and requests prompt help. A pump truck is not long in forthcoming, which is why the pits do not overflow.

36. Two of the ten hog houses developed small cracks in the concrete around their bases, but the cracks were repaired when the defects were discovered. On one occasion, one house began to seep over with the accumulated waste in its pit, but

the seepage was small and did not flow anywhere. (Depo. Harmon, 31–36.)

37. The accumulated litter in the waste pits is pumped into a "honeywagon" about twice a year and spread on surrounding fields as fertilizer. Harmon testified that even in the amounts spread as fertilizer, there would not be runoff from the Low Gap Hog Farm that would affect the Sallee property, because the litter would soak into the ground, especially considering the expanse of forest between the two locations. (Depo. Harmon, 69–70.)

38. Higbee engaged three experts for the purpose of taking water samples from various locations involved in this lawsuit and testing these samples for various forms of pollution. The most pertinent tests were those for fecal coliform colonies, which are masses of colon bacilli excreted in the feces of warm-blooded animals. Other tests were done to detect the presence of heavy metals and other chemical pollutants. The testing methods were flawed, and the results were totally inconclusive.

39. Two geologists testified regarding the physical hydrology of the Low Gap area. Dr. Ken Steele is a geologist and physical hydrologist from the University of Arkansas at Fayetteville. Dr. Steele tested 19 water sources. Ten were in the immediate vicinity of the Low Gap Hog Farm, the ravine along the Low Gap Road, and the Higbee residence. Nine were control sites in the Brentwood area. Dr. Steele examined the samples taken from these sources for specific conductivity and alkalinity, and for the presence of sodium chloride, lead, calcium, nitrates, phosphates, sulfates, manganese, iron, cobalt, nickel, cadmium, zinc, potassium, and strontium. While the readings taken from the samples fluctuated, they were basically within normal values. The Higbee well did test out at slightly over the norm in lead content. (Depo. Dr. Steele, 109.) However, Dr. Steele stated that there was not "enough of the right kind of data to make meaningful interpretations in terms of fecal coliform or lead content or nitrate or whatever." (Depo. Dr. Steele, 150.) He could not assert with any degree of conviction that the Low Gap Hog Farm was polluting any of the water sources he tested. His final conclusion, based on his expertise in physical hydrology, is the undisputed fact that water flows downhill.

40. In addition to Dr. Steele, Leslie E. Mack, a geologist and Director of the Arkansas Water Resources Research Center of the University of Arkansas, also testified for the plaintiff. Mr. Mack did not run any tests, and relied on Dr. Steele's data to form his opinions. He had no other evidence to support his conclusions. Like Dr. Steele's testimony, Mr. Mack's testimony established little more than the fact that water runs downhill.

41. Mr. Joe D. Henry, a microbiologist with American Interplex Corporation, was plaintiff's expert in the area of fecal coliform testing. Mr. Henry indicated that fecal coliform bacteria originate in the gut of warm-blooded animals, including such common Northwest Arkansas denizens as hogs, cattle, chickens, dogs, deer, and humans.

42. Mr. Henry personally collected samples from five water sources in the vicinity of the Higbee residence, and from six other sites in the Brentwood area. No one except one of plaintiff's attorneys was present when these samples were collected. In addition, Mr. Henry also ran fecal coliform tests on some of the water samples collected by Dr. Steele. With the exception of the Higbee well, no site was sampled more than twice, and most were only sampled once. Mean values reported were based on only two samples. No results were reported on some of the samples collected. Mr. Henry's fecal coliform counts fluctuated wildly. An "unnamed creek" tested out at 113 fecal coliform counts per 100 ml. of water on June 19, 1984, but showed 1333 counts on June 21, 1984. Greasy Creek went from 22 counts to 1162. Hutchins Creek, in the same time period, dropped from 1280 to 610. The four counts from tests of the Higbee well were 132 on June 19, 1984; 80 on June 21, 1984; 0 on July 29, 1984; and 68 on August 12, 1984.

(PX 28). No explanation was given for these variations in test results.

43. Data developed by testing water sources is the very essence of the proof required in a water pollution case. Such data should be thorough, should be based on scientifically acceptable methodology, and should be in readable form. The proof in this case falls far short of these requirements. The data collected by plaintiff's experts is inadequate, in terms of both quantity and methodology, to establish as fact plaintiff's allegation that waste produced on the Low Gap Hog Farm was the cause of any pollution which might exist in her water sources, or in any navigable stream or water of the United States. Monitoring data collected on the West Fork of the White River by the Arkansas Department of Pollution Control and Ecology, contained in plaintiff's exhibit 19, utilizes 20 samples to determine a mean fecal coliform count. The samples ranged from 8.0 to 600.0 fecal coliform count, for a mean of 49.7. Mr. Henry's technique, utilizing only two samples, could have produced a mean value of 304.0 based on those readings. The fewer samples tested, the less accurate the results. Such methodology is at best inaccurate, and the results of such tests are not probative.

## CONCLUSIONS OF LAW

1. All parties to this lawsuit are citizens and residents of Washington County, Arkansas. Jurisdiction in this Court is predicated upon 28 U.S.C. § 1331 and 33 U.S.C. § 1365(a). The alleged source of discharge is located in Washington County, Arkansas, and venue is therefore proper in this Court pursuant to 33 U.S.C. § 1365(c)(1).

2. Higbee alleges that the ditch or ravine running down Low Gap Road past her former residence feeds into London Creek, as does the spring, and that London Creek feeds the West Fork of the White River, which eventually flows into Beaver Lake. Higbee contends that all these waterways are navigable waters of the United States for purposes of the Clean Water Act. The defendants did not contest this allegation, and for the purposes of this litigation we assume these waterways to be covered by the provisions of the Clean Water Act.

3. On February 8, 1982, Higbee gave notice to Starr, Tyson and Harmon that she intended to file suit against them for violations of the Clean Water Act. This notice was given pursuant to 33 U.S.C. § 1365(b), and was sufficient to comply with statutory requirements.

4. 33 U.S.C. § 1311(a) provides that "except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1362 includes in its definition of person "an individual, corporation, partnership, association...." Pollutant includes "agricultural waste." The term "discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." Point source includes a "concentrated animal feeding operation." 33 U.S.C. § 1362. The Low Gap Hog Farm is a concentrated animal feeding operation, and the hog waste which accumulates in the holding basins is agricultural waste. Any discharge of hog waste by the Low Gap Hog Farm into tributaries of the White River violates 33 U.S.C. § 1311 unless done in compliance with the mandates of the Clean Water Act.

5. 33 U.S.C. § 1342 provides for the issuance of discharge permits either by a federal agency, or by a state agency, once the state agency has promulgated federally acceptable guidelines. Discharge of pollutants without such a permit is a violation of the Clean Water Act. No federal or state discharge permit has been shown to be issued to the Low Gap Hog Farm. However, the Low Gap Hog Farm was issued Permit No. 2485–W by the Arkansas Department of Pollution Control and Ecology on December 3, 1980. This permit authorized construction, operation and maintenance of a "no discharge" waste disposal system in connection with the hog finishing operation. The "no discharge" system provided for waste disposal by spreading on

specified pasturelands, within guidelines designed to prevent runoff and to promote conservation. The permit may be revoked or modified as necessary to prevent water pollution. No such revocation or modification has been necessary, in the opinion of the Arkansas Department of Pollution Control and Ecology. Numerous investigations and inspections, many of them occasioned by this lawsuit, have revealed no permit violations, with the exception of the "dead pits" which have been eliminated. Because the Low Gap Hog Farm is a closed, "no discharge" system, the discharge permit provisions of 33 U.S.C. § 1342 do not apply to it.

6. Higbee failed to show a causal connection between the hog finishing operation at the Low Gap Hog Farm and the presence of any pollution which was detected in her water supply. There was, furthermore, no credible evidence that any pollutants from the Low Gap Hog Farm have ever been discharged into any navigable waters of the United States. Therefore, on the evidence adduced, the defendants are not in violation of any provisions of the Clean Water Act. Because it is the finding of this Court that the Low Gap Hog Farm did not discharge pollutants into any waterway, it must also be the finding of this Court that the defendants are not liable for battery or trespass by pollutants, or for infliction of emotional distress as alleged in the complaint.

7. The Court further concludes that the evidence of pollution in the West Fork of the White River is far short of conclusive, as is evidence of pollution of any water found on the Low Gap Hog Farm. The evidence of water pollution on the Sallee property is only slightly more probative. Upon thorough review and consideration of all the evidence, this Court concludes that any pollution existing in the water sources on the Sallee property was caused by the unsanitary practices of Higbee and her family, both in regard to their placement, rotation, and disposal of outhouses and human wastes, and in regard to the husbandry of her animals, which were allowed to roam freely, and drink, swim and bath in, and foul all of her water sources.

CONCLUSION

In conclusion, there does not seem to be any substantial disagreement over the law which governs the discharge of pollutants by an operation such as the Low Gap Hog Farm. If any such discharge is made, it must be made pursuant to a permit, and must meet specified conditions set forth in the permit, based on state and federal statutes. It is not contested that the Low Gap Hog Farm did not possess permits to discharge wastes. What Higbee failed to establish is that a discharge of pollutants was in fact being made by the Low Gap Hog Farm. Quite the contrary. Water samples taken for the purpose of demonstrating that pollutants were discharged from the Low Gap Hog Farm are inconclusive. Photographs of the hog farm taken to demonstrate such discharge of pollutants reveal a clean and efficient operation. The only seepage ever found and photographed is a small amount (maybe one-half gallon) which leaked from house number 9 on one occasion. On one other occasion, a pipe leading out from the holding basin in house number 5 was broken off by a mower, and some of the liquid waste escaped. A photograph of the spill was made before the pipe was repaired. No other evidence that any liquid had escaped from the holding basins was adduced. As for the spreading of the waste on nearby pastures, it was established that this created an offensive odor, but the odor was temporary, and did not affect very many area residents. Spreading was done under carefully drafted standards to prevent runoff and to promote conservation. Higbee put on evidence that on one, or perhaps two, occasions the litter was spread during wet weather, which violated spreading guidelines. George Harmon testified that this had to be done if the basins reached their capacity in such weather, and no house-to-house transfer of the waste was possible. Wet-weather spreading clearly was not the policy of the farm, and no pollution was traced to the spreading of

waste during wet weather. As for the disposal of dead hogs, prior to 1982, dead hog disposal via "dead pits" was indeed substandard. However, no pollution was linked, to the substandard disposal practices, and they have since been altered to conform to state and federal standards. Plaintiff has simply failed to establish causality, an essential element in proving liability in any of plaintiff's causes of action. It is the finding of this Court that any pollution around the Higbee residence during 1978–1982 was caused by unsanitary practices of the Higbee family themselves. Because the defendants are not responsible for any such pollution, the issue of damages need not be reached in this opinion. The case is hereby dismissed as to all defendants.