CONCERNED AREA RESIDENTS
FOR THE ENVIRONMENT,
et al., Plaintiffs,

v.

SOUTHVIEW FARM and Richard
Popp, Defendants.

No. 91–CV–6031L.

United States District Court,
W.D. New York.

April 7, 1993.

**1412**

Donald W. O'Brien, Woods, Oviatt, Gilman, Sturman & Clarke, Alan J. Knauf, Alan J. Knauf & Associates, P.C., Robert J. Burke, Burke & Rzepka, Rochester, NY, for plaintiffs.

John W. Clarke, Althena Jamesson, Harris, Beach & Wilcox, Rochester, NY, for defendants.

Jeffery H. Kirby, Glenmont, NY, for New York Farm Bureau, Inc. and American Farm Bureau amicus curiae.

### DECISION AND ORDER

LARIMER, District Judge.

#### BACKGROUND [1]

This is a citizen suit under the Federal Water Pollution Control Act, also known as the Clean Water Act ("CWA" or "the Act"), 33 U.S.C. § 1251 *et seq*. Plaintiffs are individual landowners residing near Southview Farm in Wyoming County, New York, who refer to themselves collectively as Concerned Area Residents for the Environment ("CARE"). Defendants are the farm itself (a partnership) and Richard Popp, who is one of the two partners.

---

1. The background of this case is set forth in this court's August 29, 1991 Decision and Order ("Dismissal Decision") which denied defendants'

The amended complaint asserts a cause of action under 33 U.S.C. § 1365, as well as pendent state causes of action for trespass, negligence, and nuisance. In general, all of these claims relate to plaintiffs' allegations that defendants store and spray manure on the farm for use as fertilizer, and that the manure enters and contaminates adjacent waters in violation of both federal and state law.

Defendants have moved for summary judgment dismissing the first (CWA), second (trespass), and fourth (nuisance) causes of action under Rule 56(b) of the Federal Rules of Civil Procedure. Plaintiffs have moved for leave to file a supplemental complaint pursuant to Rule 15(d). In addition, the New York Farm Bureau, Inc., and its national organization, American Farm Bureau Federation (jointly referred to as "Farm Bureau"), have moved for leave to file an *amici curiae* brief.

### DISCUSSION

*I. Plaintiffs' Motion for Leave to File a Supplemental Complaint*

Plaintiffs seek to supplement the complaint in three respects. First, plaintiffs wish to allege CWA violations arising out of manure discharges that occurred after this suit was commenced.

Second, plaintiffs seek to add another CWA claim based on alleged violations which plaintiffs learned about during discovery. These violations involve defendants' use of chemicals to wash down "milking parlors" on Southview Farm. The chemicals are then allegedly mixed with liquid manure in lagoons, and the mixture is eventually spread on Southview Farm's fields.

Third, plaintiffs want to add a pendent claim alleging that one particular discharge in July 1992 was done intentionally to harm and cause emotional distress to plaintiffs Phillip and Kathleen Karcheski.

Under Rule 15(d), the court may "permit [a] party to serve a supplemental

---

motion to dismiss the complaint. Familiarity with that decision is assumed.

pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."[2] In general, when the events sought to be added relate to the prior pleading, leave is freely granted, absent undue delay, bad faith, dilatory motive or prejudice to the non-movant. 3 James W. Moore, et al., Moore's Federal Practice ¶ 15.16[3] (1992 ed.).

■ The allegations sought to be added here do relate to the claims in the amended complaint, and I will therefore grant plaintiffs' motion. Although the new CWA claim deals not with manure application but with chemicals used to clean defendants' "milking parlors," it is related to the prior claims in that the chemicals are allegedly mixed with the same liquid manure, in the same or similar holding ponds, as alleged in the amended complaint. Furthermore, since the facts concerning the use and disposal of these chemicals are within defendants' knowledge, there appears to be little prejudice to defendants by the addition of this claim. The lack of prejudice is reflected by the fact that defendants have extensively addressed the merits of this new claim in their motion for summary judgment.

Similarly, although the pendent emotional distress claim will inject some new issues into the case, it will not do so in any significant degree. Even if this claim were disallowed, there would probably still be proof of the incident involved, since that event also relates to the CWA claim. In addition, although this claim involves issues of intent, such issues are already present in the trespass claim. In my view, then, all these new claims are sufficiently related to the existing claims, and defendants would not suffer undue prejudice by their addition to the case.

## II. Farm Bureau's Motion for Leave to Submit an Amicus Brief

Farm Bureau, a private organization representing farmers' interests, seeks leave to submit an *amicus* brief. Farm Bureau contends that its members (23,000 families in New York State and four million members nationwide) stand to be significantly affected by the court's decision on defendants' motion.

Plaintiffs oppose the motion for several reasons. Plaintiffs contend that Farm Bureau has already participated in this action by contributing at least $10,000 to defray defendants' legal costs, and that Farm Bureau's interests are therefore already adequately represented by defendants. Plaintiffs also argue that Farm Bureau has improperly attempted to inject new issues into the case which were not raised by the parties.

■ District courts have broad discretion in deciding whether to accept *amicus* briefs. *Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir.1982). The partiality of a would-be *amicus* is a factor to consider in making that decision, but "[t]here is no rule ... that amici must be totally disinterested." *Id.* Indeed, "by the nature of things an amicus is not normally impartial." *Strasser v. Doorley*, 432 F.2d 567, 569 (1st Cir.1970).

■ After reviewing the papers submitted in connection with Farm Bureau's motion, I will accept the *amicus* brief. I am not persuaded that Farm Bureau's participation in this lawsuit thus far has made it an inappropriate *amicus* for purposes of deciding defendants' motion. Furthermore, to the extent that Farm Bureau goes beyond its proper role by attempting to present wholly new issues, the court can remedy any possible prejudice to plaintiffs by simply declining to consider those issues. *See, e.g., Application of City of Buffalo*, 57 A.D.2d 47, 49, 394 N.Y.S.2d 919 (4th Dep't 1977).

## III. Defendants' Motion to Dismiss the CWA Claim

### A. Injury in Fact

Defendants allege that plaintiffs have failed to demonstrate standing to bring a

---

**2.** Since the second set of allegations relates to events occurring prior to the commencement of this action, albeit continuing to the present day, arguably they should be the subject of a motion to amend the complaint under Rule 15(a). Since the standard for deciding whether to grant leave to amend is similar to that on a Rule 15(d) motion, however, the distinction is of little significance here. *See* 6A Charles A. Wright, et al., Federal Practice and Procedure § 1504 (2d ed. 1990).

CWA claim. Defendants argue that plaintiffs have failed to show any injury, or, if they have, that they have not shown that the injury was caused by defendants' activities.

The Clean Water Act provides that "any citizen may commence a civil action ... against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation ..." 33 U.S.C. § 1365(a)(1).

■ In order to meet this standard, plaintiffs must allege an "injury in fact" under the requirements set forth in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). This means that "the plaintiff must have suffered ... an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical." ' " *Lujan v. Defenders of Wildlife*, — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). In addition, "there must be a causal connection between the injury and the conduct complained of," *id.*, and "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* The injuries may be physical, economic, or aesthetic in nature. *Sierra Club v. SCM Corp.*, 580 F.Supp. 862, *aff'd*, 747 F.2d 99 (2d Cir.1984).

■ In response to defendants' motion to dismiss for lack of standing, plaintiffs rely primarily on their allegations of aesthetic harm at paragraph 49 of the amended complaint, which alleges that "[i]ntense, obnoxious odors have made the atmosphere at plaintiffs' properties unbearable or undesirable to breathe," and that "[p]laintiffs have been required to alter their lifestyles, the quality of their lives have [sic] been degraded, and they have sustained great inconvenience, discomfort, and annoyance."

Defendants argue that the allegations of aesthetic harm do not support this cause of action. Defendants contend that only plaintiffs Philip Karcheski and Kirk Bly have alleged any link between the odor and the alleged point source discharges, and that those two plaintiffs have nothing to support those claims but speculation.

After reviewing the allegations of the amended complaint and the plaintiffs' affidavits, I find that plaintiffs have sufficiently alleged an injury-in-fact. First, it is clear that aesthetic harm or harm to one's quality of life may support a CWA claim, as long as the plaintiff is among the persons adversely affected. *See Sierra Club*, 405 U.S. at 734–35, 92 S.Ct. at 1366; *Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 71 (3d Cir.1990), *cert. denied*, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991).

The present record presents an issue of fact concerning whether plaintiffs have suffered aesthetic injuries. Plaintiffs' affidavits allege that they have seen and smelled manure-laden watercourses near, and sometimes adjacent to, Southview Farm. Plaintiffs also allege that this pollution eventually finds its way into other streams in the area, including the Genesee River in nearby Letchworth State Park. Plaintiffs allege that these sights and smells are offensive and have diminished their quality of life and their ability to enjoy the surrounding environment.

Contrary to defendants' contentions, more than two of the plaintiffs have alleged a causal connection between this harm and the point source discharges. For example, plaintiff Lois Link alleges that she and her son witnessed and videotaped a discharge on February 19, 1991. She also alleges that the streams and creeks in the area are frequently fouled by liquid manure, and that the condition of the waterways offends her. It is a fair reading of these allegations to interpret them as alleging that the February 19 discharge was one of a series of discharges that have continually polluted the streams in the area. To demand that plaintiffs trace particular instances of when they were repelled by such odors or scenes to particular discharges which they witnessed would, in my view, take an overly-strict approach to the standing requirements and would place an onerous burden on plaintiffs. *Powell Duffryn*, 913 F.2d at 72 (plaintiff need not prove causation to a scientific certainty to defeat summary judgment motion).

This is not to say that plaintiffs have no obligation to show a connection between the pollution and defendants' activities. Plaintiffs' affidavits, however, do allege discharges into waterways, and consequent aesthetic harm.

Furthermore, plaintiffs' allegations are supported by the expert testimony of Jeffrey R. Chiarenzelli, who holds a Ph.D. in geology and works as a consultant in hydrogeology and environmental geology, and of Dale E. Baker, who holds a doctorate in Soil Physical Chemistry and is a professor of soil chemistry. In affidavits, both these men express the opinion that waterways adjacent to Southview Farm have been contaminated by manure which has been spread on the Farm, or by chemicals from the manure. Although defendants dispute this, I find that these expert opinions, in conjunction with plaintiffs' personal observations and experiences, suffice to create an issue of fact concerning whether plaintiffs have been harmed by defendants' alleged point source discharges. Accordingly, plaintiffs do not lack standing for failure to show injury-in-fact.

### B.   Lack of a SPDES Permit

■ Defendants argue that plaintiffs' claims fail because there is no allegation that defendants have violated the terms of any State Pollution Discharge Elimination System ("SPDES") permit. Defendants contend that a CWA citizen suit, as opposed to a suit by the Government, can only be brought to enforce a SPDES permit, and that if there is no permit to begin with, there can be no citizen suit.

This argument requires little discussion. In *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir.1991), *rev'd in part on other grounds*, —— U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), the Court of Appeals affirmed a district court decision following a bench trial which found that a city had violated CWA by discharging pollutants without a permit. *See Dague v. City of Burlington*, 732 F.Supp. 458, 469–70 (D.Vt.1989). Indeed, to hold otherwise would be to invite polluters to avoid liability by simply failing to obtain a permit in the first place, a result which Congress could not have intended.

Defendants' reliance on *Atlantic States Legal Foundation v. Eastman Kodak Co.*, 809 F.Supp. 1040 (W.D.N.Y.1992), is misplaced. The court in that case held that in "a citizen suit *against a permit holder*," a CWA violation cannot be established unless the plaintiff shows a violation of a permit condition. *Id.* at 1045. Since the defendant there did have a SPDES permit, *Atlantic States* is factually inapposite to the case at bar.

### C.   Ongoing Violations

Defendants argue that although the complaint alleges continuing violations of the Act, for summary judgment purposes plaintiffs have not sufficiently supported this allegation, but have shown only *past* violations.

■ The Supreme Court has held that "citizens ... may seek civil penalties [under CWA] only in a suit brought to enjoin or otherwise abate an ongoing violation." *Gwaltney of Smithfield v. Chesapeake Bay Found.*, 484 U.S. 49, 59, 108 S.Ct. 376, 382, 98 L.Ed.2d 306 (1987). A citizen suit, then, unlike an action by the Government, cannot be brought to recover for wholly past violations.

■ To support a dismissal of a CWA complaint on this ground, defendant bears the burden of establishing "that it is '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 66, 108 S.Ct. at 386 (quoting *United States v. Phosphate Export Ass'n, Inc.* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)) (alteration in original). Plaintiffs, on the other hand, may show an ongoing violation either by proving violations that occurred on or after the filing of the complaint, or by adducing evidence of a continuing *likelihood* of recurrence by intermittent or sporadic violations. *Chesapeake Bay Found. v. Gwaltney of Smithfield*, 890 F.2d 690, 693 (4th Cir.1989).

■ In the case at bar, plaintiffs attempt to establish an ongoing violation in both these ways. First, plaintiffs contend that since the discharges alleged in the complaint were the result of manure application practices and procedures that defendants are

continuing to follow, further discharges are likely.

Plaintiffs also allege that actual discharges have occurred since the amended complaint was filed on May 31, 1991. In particular, plaintiffs allege "continuous" daily discharges of chemical wastes from a lagoon on South-view farm, a discharge of liquid manure from a broken pipe in July 1992, a discharge into a stream or ditch in October 1991, and a discharge onto a road in July 1992. Clarke Aff. Ex. C. Plaintiffs also allege two discharges between the filing of the original and the amended complaints. *Id.*

Defendants' attempt to show that these alleged discharges do not show an *ongoing* violation is not persuasive. Defendants admit that the July 1992 pipe break occurred, but state that it was an "isolated and transient" event. Def. Mem. of Law p. 37. Defendants also admit the roadway discharge in that same month, but minimize it as involving only a small amount of manure.

■ I believe that plaintiffs have adduced sufficient evidence to avoid summary judgment and to proceed to trial. The test for continuity as set forth in the *Gwaltney* cases is not a stringent one. Minimizing the significance or importance of the post-complaint discharges by characterizing them as small or isolated events does not meet defendants' burden—which the Supreme Court has said "is a heavy one," *Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386—of proving that it is "absolutely clear" that the discharges will not recur. *Id.*

Plaintiffs' argument that defendants are using the same practices and procedures that caused the discharges alleged in the complaint is also well-taken. Plaintiffs' case is based in part on the theory that defendants' usual method of spreading manure has led to recurring discharges. Defendants do not contend, and there is no proof in the record, that defendants have now ceased using those methods. It remains to be seen whether plaintiffs can prove at trial that the discharges have occurred and that they are causally related to defendants' procedures. Plaintiffs' allegations, however, which have some support in the affidavits submitted in opposition to defendants' motion, do suggest a continu-

ing likelihood of recurrence in intermittent or sporadic violations, *Gwaltney*, 890 F.2d at 693, sufficient to defeat a motion for summary judgment.

### D. *Manure as a "Pollutant"*

■ Defendants argue that the manure is not a "pollutant" as that term is used in 33 U.S.C. § 1311(a), which makes unlawful "the discharge of any pollutant" unless in compliance with CWA. Although the definition of "pollutant" at 33 U.S.C. § 1362(6) includes, *inter alia*, "solid waste," "sewage," "biological materials," and "agricultural waste," defendants contend that an analysis of applicable federal regulations demonstrates that the manure as it is used by defendants is not a "pollutant" because it is not "discarded," but is used as fertilizer.

I am not persuaded by defendants' argument. For one thing, there is case law supporting the view that manure—including manure used as fertilizer—is a pollutant under the Act. In *Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055 (5th Cir.1991), the Fifth Circuit reversed a decision which had dismissed a CWA suit for lack of standing where plaintiffs alleged that discharges from certain holding ponds on a cattle feedlot had violated CWA. Waste from the feedlot, primarily cow manure, drained into these ponds, and the defendant then used the water to irrigate and fertilize its fields. Although not directly faced with the issue of whether the manure-laden water constituted a pollutant, the court clearly treated it as such.

Similarly, in *Higbee v. Starr*, 598 F.Supp. 323 (E.D.Ark.1984), *aff'd*, 782 F.2d 1048 (8th Cir.1985), although the court dismissed the action following a bench trial for lack of causation, it concluded as a matter of law that hog waste that had accumulated in holding basins on the defendant's farm, and which was then mixed with water and used as fertilizer, was "agricultural waste." *Id.* at 330. The court further held that any discharge of that waste into an adjacent river would violate 33 U.S.C. § 1311 unless done in compliance with CWA. *Id.; see also United States v. Frezzo Bros., Inc.*, 546 F.Supp. 713 (E.D.Pa.1982) (discharge of compost made

partially from chicken manure for use in growing mushrooms violated CWA), *aff'd,* 703 F.2d 62 (3d Cir.), *cert. denied,* 464 U.S. 829, 104 S.Ct. 106, 78 L.Ed.2d 109 (1983).

Furthermore, aside from these cases, the regulations relied upon by defendants do not support their position. First, the regulations cited relate not to CWA but to the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.,* and are therefore of limited relevance to this case. The fact that CWA does not define "agricultural waste" or "solid waste" does not justify lifting definitions from other acts absent some indication that Congress intended the terms to have the same meaning in both statutes.

Second, defendants have focused on RCRA's definition of "solid waste," and have ignored CWA's inclusion of "sewage," "biological materials," and "agricultural waste" within the term "pollutants." Defendants have failed to offer any cogent reasons why manure could not be included among those categories.

Third, the RCRA regulations themselves implicitly support the view that manure used as a fertilizer constitutes solid waste. The regulations state that:

The following *solid* wastes are not hazardous wastes:

\* \* \* \* \* \*

(2) Solid wastes generated by any of the following and *which are returned to the soils as fertilizers:*

\* \* \* \* \* \*

(ii) The raising of animals, *including animal manures.*

40 C.F.R. § 261.4(b)(2)(ii) (1992) (emphasis added). Thus, the regulations include manure as non-hazardous solid waste.

Neither the statutes nor the case law, then, supports defendants' position that manure is not a pollutant under CWA. The relevant authority is directly to the contrary.

*E. Discharge From a "Point Source"*

■ To establish that a CWA violation has occurred, plaintiffs must show a discharge of pollutants into navigable waters from a "point source." 33 U.S.C. §§ 1311(a), 1362(12). Defendants argue that plaintiffs have not met this requirement.

"Point source" is defined at 33 U.S.C. § 1362(14) as

any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

An "animal feeding operation" is defined at 40 C.F.R. § 122.23(B)(1), as

a lot or facility ... where[:]

(i) Animals ... have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period, and

(ii) Crops, vegetation forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.

A "concentrated animal feeding operation" is defined at § 122.23(b)(3) as an animal feeding operation which meets the criteria in appendix B of Part 122, which includes operations in which more than 700 mature dairy cattle are confined. Plaintiffs allege, and defendants have not denied, that Southview Farm holds more than 700 dairy cattle.

I note at the outset that whether a discharge occurred from a point source is a question of fact. *See United States v. Gratz,* Cr. No. 92–141, 1993 WL 19733, \*9 n. 4, 1993 U.S.Dist. LEXIS 629 \*19 n. 4 (E.D.Pa. January 26, 1993) (citing *United States v. Oxford Royal Mushroom Products, Inc.,* 487 F.Supp. 852 (E.D.Pa.1980)); *see also United States v. Baytank (Houston) Inc.,* 934 F.2d 599, 603 (5th Cir.1991) (approving trial court's instruction to jury that jury had to find discharge from a point source in order to convict defendant of CWA violation); *Sierra Club v. Abston Constr. Co.,* 620 F.2d 41, 46–47 (5th Cir.1980) (issues of fact remained concerning whether basins constructed by defendant were point sources); *State of Idaho v. Hanna Mining Co.,* 699 F.Supp. 827,

832 (D.Idaho 1987) (record not sufficient to show whether damages were caused by point source discharges or non-point discharges), aff'd, 882 F.2d 392 (9th Cir.1989); *South Carolina Wildlife Federation v. Alexander,* 457 F.Supp. 118, 126–27 (D.S.C.1978) (decision on whether turbine units were point sources would await proof at trial).

Although the question is a close one, I find that there are genuine issues of material fact concerning whether defendants' alleged discharges originated from a point source. First, as I noted in my prior decision denying the motion to dismiss,[3] the courts have given "point source" a broad construction. *See* Dismissal Decision pp. 4–5. The Second Circuit has recently reaffirmed that approach, stating that "[t]he definition of a point source is to be broadly interpreted" to " 'embrac[e] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States.' " *Dague,* 935 F.2d at 1354 (quoting *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 373 (10th Cir.1979)). In view of this recent strong statement from the Second Circuit, this Court would be ill-advised to take a more restrictive view.

I find that plaintiffs have submitted sufficient evidence that would support a finding that defendants' farm is a point source.

Defendants rely in part on their assertion that the pollutants, if any, migrate because of rainwater run-off. However, the fact that some of the alleged discharges may have resulted from rainwater run-off does not necessarily mean that the discharges did not originate from a point source. "Notwithstanding that it may result from such natural phenomena as rainfall and gravity, the surface run-off of contaminated waters, once channeled or collected, constitutes discharge by a point source." *Residents Against Industrial Landfill Expansion v. Diversified Systems, Inc.,* 804 F.Supp. 1036, 1039 (E.D.Tenn.1992) (quoting *O'Leary v. Moyer's*

*Landfill, Inc.,* 523 F.Supp. 642 (E.D.Pa. 1981)).

The essential question on this issue is the degree to which defendants' activities were responsible for the discharge of pollutants into navigable waters. The Act is not meant to prohibit "naturally-induced, random run-off of pollutants," *United States v. Villegas,* 784 F.Supp. 6, 9 (E.D.N.Y.1991), but it does cover "surface runoff collected or channeled" by defendants. *Abston,* 620 F.2d at 47.

*Abston* is particularly instructive in this regard. In that case, the defendants, in the course of strip-mining operations, had placed removed rock material known as "overburden" in "spoil piles," which were highly erodible. Rainwater runoff then carried the material to adjacent streams. Rejecting both the plaintiff's argument that a point source discharge had been shown simply because the original source of the pollution was a man-made pile, and the defendants' contention that a point source discharge could never include a discharge of pollutants through naturally-created ditches, the court held that "surface runoff collected or channeled by the operator constitutes a point source discharge." *Id.* at 44–45. The court stated that a point source would exist if the defendants had created spoil piles

> such that, during periods of precipitation, erosion of spoil pile walls results in discharges into a navigable body of water by means of ditches, gullies and similar conveyances, even if the miners have done nothing beyond the mere collection of rock and other materials.... Nothing in the Act relieves miners from liability simply because the operators did not actually construct those conveyances, so long as they are reasonably likely to be the means by which pollutants are ultimately deposited into a navigable body of water.

*Id.* at 45. *See also Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 922 (5th Cir.1983) (bulldozers and backhoes were point sources, since they collected into wind-

---

**3.** Plaintiffs contend that the Dismissal Decision constitutes the law of the case concerning the point-source issue, and that summary judgment is therefore barred as long as plaintiffs have submitted some evidence to support the allegations in the complaint. Although I agree that

summary judgment is inappropriate here, I note that the law-of-the-case doctrine would not bar me from altering my findings in this respect if I found that it were warranted. 1B James W. Moore, et al., Moore's Federal Practice ¶ 0.404[4.–1] (1992 ed.)

rows and piles material that may ultimately have found its way back into navigable waters).

In the case at bar, plaintiffs have presented photographs and both lay and expert testimony tending to show that Southview Farm contains both natural and man-made streams and ditches which, if plaintiffs' allegations are true, can and have conveyed pollutants from defendants' manure-spreading activity into navigable waters. For example, Dr. Chiarenzelli states in his affidavit that watercourses originating on, or passing through, Southview Farm eventually discharge into the Genesee River, and that chemicals from liquid manure have been carried through these waterways into the river. Chiarenzelli Aff. p. 6–7.

Dr. Baker's opinions also support plaintiffs' side of this factual dispute. He states that furrows created by defendants' plowing act as conduits for manure to discharge into natural watercourses. He attributes this problem to a combination of improper manure application practices and improper plowing methods and procedures. Several photographs accompanying his affidavit purport to demonstrate these problems. If these allegations are true, they could support a finding that a point source discharge has occurred. *See Oxford Royal Mushroom Products,* 487 F.Supp. at 854 (discharges resulting from spraying fields with overabundance of waste water, which in turn ran off into stream through break in berm around fields, could be point source discharges); *cf. Higbee,* 598 F.Supp. at 331 (CWA violation not found where evidence showed that defendants' spreading of manure was done under carefully drafted standards to prevent runoff and promote conservation).

In addition to these expert opinions, plaintiffs' own affidavits are some evidence that point source discharges have occurred. In general, plaintiffs allege that they have witnessed discrete furrows or ditches on Southview Farm carrying liquid manure. *See, e.g.,* Link Aff. ¶ 6; Wilson Aff. ¶ 6; Bly Aff. ¶ 5D.

Furthermore, several alleged incidents (discussed in Section "C," *supra*) do not involve run-off, but discharges from distinct sources, including a broken pipe and a truck.

Defendants' attempts to undermine the evidentiary support for these incidents, like their arguments that these events were isolated and transient, is more properly a matter for the factfinder to consider in determining the weight to be given to this evidence.

The same is true of defendants' contention that there is no proof to support plaintiffs' allegation of leakage from the lagoon in which the manure is stored. Plaintiffs' expert, Dr. Baker, has opined that the lagoon does leak, based on his understanding of its composition and manner of construction, and on chemical tests he analyzed of nearby soil and groundwater. Baker Aff. ¶ 17. While the proof of leakage could certainly be stronger, I am not prepared at this stage to rule that no reasonable jury could find leakage to have occurred after hearing all the evidence at trial.

There are also factual issues relating to whether Southview Farm is a "concentrated animal feeding operation" under 40 C.F.R. § 122.23, which would automatically make it a point source. *See Higbee,* 598 F.Supp. at 330 (hog farm was a concentrated animal feeding operation, and therefore any discharge of hog waste into navigable waters had to done in compliance with CWA). The farm appears to meet the requirement that it contain over 700 mature dairy cattle for at least 45 days per year. What is less clear is whether crops are "sustained in the normal growing season over any portion of the lot or facility." 40 C.F.R. § 122.23(b)(1). If so, it would not be a concentrated animal feeding operation.

Plaintiffs concede that crops are grown on fields adjacent to the area in which the cattle are housed. That fact, however, does not necessarily disqualify the farm from meeting the definition in § 122.23. In *Carr,* 931 F.2d 1055, waste from a cattle feedlot drained into a wastewater disposal system of six holding ponds, and was then used by the defendants to irrigate and fertilize adjacent fields. The court held that the feedlot was a concentrated animal feeding operation, and therefore a point source. Although *Carr* was not factually identical to the instant case, the discharge in *Carr* having occurred directly from one of the holding ponds during a heavy rainstorm,

it does suggest that the presence of adjacent crop-bearing fields is not in itself dispositive of this issue.

## IV.   Defendants' Motion to Dismiss the Trespass Claim

Defendants argue that the trespass claim should be dismissed because plaintiffs have not shown any harm, or the requisite intent on the part of defendants.

"Under New York law, trespass is the interference with a person's right to possession of real property either by an unlawful act or a lawful act performed in an unlawful manner." *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1361 (2d Cir.1989). "To be liable, the trespasser need not anticipate the damaging consequences of his acts, but need only intend the act that amounts to an unlawful intrusion upon and interference with the property rights of another." *Id.*

Although the matter is not free from doubt, I will deny defendants' motion for summary judgment on this claim. It is not clear whether New York law recognizes a cause of action for trespass based on the entry of odors or gases onto another's property. The traditional common-law view is that, inasmuch as such intangible entries onto land do not interfere with the right of exclusive *possession* of real property, but only with the *use and enjoyment* of property, they do not give rise to a trespass, though they can support a nuisance claim. *Mock v. Potlatch Corp.,* 786 F.Supp. 1545 (D.Idaho 1992) (reviewing case law of various jurisdictions).

Under some circumstances, though, New York law does recognize trespass claims arising out of the entry of foreign substances onto one's property. In *Phillips v. Sun Oil Co.,* 307 N.Y. 328, 121 N.E.2d 249 (1954), the court affirmed an order which dismissed a trespass claim at the close of plaintiff's case at trial, where there was proof that gasoline from the defendant's underground tank had found its way into the plaintiff's well. While holding that the plaintiff had failed to show the requisite willfulness to support a trespass claim, the court clearly indicated that such a claim could be sustained if the defendant "had good reason to know or expect that subterranean and other conditions were such that there would be passage from defendant's to plaintiff's land." *Id.* at 331, 121 N.E.2d 249.

The few reported post-*Phillips* cases involving trespass claims for the entry of liquids onto real property reveal that the viability of the claim depends upon the facts of the case. In *Snyder v. Jessie,* 164 A.D.2d 405, 565 N.Y.S.2d 924 (4th Dep't 1990), *app. dismissed,* 77 N.Y.2d 940, 569 N.Y.S.2d 613, 572 N.E.2d 54 (1991), an action by homeowners against a heating oil distributor, the court held that the plaintiffs' allegation that the defendant had delivered an excessive amount of oil to the plaintiffs' neighbor, causing oil to migrate into groundwater on the plaintiffs' property, did not state a cause of action for trespass, as the plaintiffs had not alleged facts tending to show that the defendant had a willful intent to intrude upon the plaintiffs' property. In *Serota v. M & M Utilities, Inc.,* 55 Misc.2d 286, 285 N.Y.S.2d 121 (Nassau Co. 1967), however, the court granted summary judgment in favor of a landowner on his claim for trespass against a fuel oil supplier who had made an unauthorized delivery of oil to the plaintiff's home. Because the oil tank was more full than the defendant expected, oil spilled on the plaintiff's lawn. The court held that the defendant's lack of intent to cast oil upon the plaintiff's land was of no moment, since the spillage was the immediate and inevitable consequence of the defendant's intentional delivery of the oil.

■ In the case at bar, there is some evidence that liquid manure, or chemicals therefrom, have entered plaintiffs' property as a result of defendants' willful activities. Some of the evidence, such as nitrate readings from plaintiffs' groundwater, is circumstantial, and its significance is in dispute. Whether this evidence will ultimately support a finding that defendants have interfered with plaintiffs' rights to exclusive possession of their property, and whether defendants should have realized the probable consequences of their actions to a degree sufficient to support this claim, remain to be seen. At this juncture, however, I am not prepared to

say that no reasonable jury could find for plaintiffs on their trespass claim.

### V. Defendants' Motion to Dismiss the Nuisance Claim

Plaintiffs assert a claim based on theories of both public and private nuisance. The former "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all ... in a manner such as to ... endanger or injure the property, health, safety, or comfort of a considerable number of persons." *State of New York v. Shore Realty Corp.*, 759 F.2d 1032, 1050 (2d Cir.1985) (quoting *Copart Indus., Inc. v. Consolidated Edison Co.*, 41 N.Y.2d 564, 568, 394 N.Y.S.2d 169, 362 N.E.2d 968 (1977)). A public nuisance may give rise to a private cause of action by one who has suffered some injury beyond that inflicted upon the public at large. *Leo v. General Elec. Co.*, 145 A.D.2d 291, 538 N.Y.S.2d 844 (2d Dep't 1989).

A private nuisance, on the other hand, "threatens one person or a relatively few ..., an essential feature being an interference with the use or enjoyment of land ..." *Shore Realty*, 759 F.2d at 1050 (quoting *Copart*, 41 N.Y.2d at 568, 394 N.Y.S.2d 169, 362 N.E.2d 968). A private nuisance is actionable by any person whose rights have been so invaded, provided that the "invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." *Copart*, 41 N.Y.2d at 569, 394 N.Y.S.2d 169, 362 N.E.2d 968 (citations omitted).

Defendants contend that the nuisance claim is fatally flawed because plaintiffs have offered no evidence that they have been damaged, or that their damages were proximately caused by defendants' actions. As the preceding discussion makes clear, however, the record in this case presents questions of fact concerning whether defendants have contaminated waterways in the area around Southview Farm, and, if so, whether they have endangered the health or comfort of the public at large. I am also not convinced at this stage that plaintiffs cannot show at trial that they have suffered some

harm peculiar to themselves by virtue of their status as landowners and residents near Southview Farm; *see Ouellette v. International Paper Co.*, 602 F.Supp. 264 (D.Vt.) (in class action by State of Vermont and Vermont residents against New York corporation whose paper mill allegedly discharged pollutants into Lake Champlain, fouling waters around plaintiffs' properties, plaintiffs' allegation that defendants' discharges interfered with plaintiffs' use and enjoyment of property and decreased properties' value stated a private cause of action for public nuisance under either New York or Vermont law), *aff'd*, 776 F.2d 55 (2d Cir.1985), *aff'd in part and rev'd on other grounds in part*, 479 U.S. 481, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987).

Likewise, there are issues of fact concerning whether defendants' activities constitute an unreasonable invasion of plaintiffs' use and enjoyment of their property. Defendants contend that the area is agricultural, and that therefore some odors are to be expected. In my view, that is a consideration for the finder of fact to take into account. While New York case law on the subject is sparse, cases from other jurisdictions support the view that odors arising from farming operations can give rise to a private nuisance, even in a predominantly agricultural area. *See, e.g., Baldwin v. McClendon*, 292 Ala. 43, 288 So.2d 761 (1974) (hog waste); *Anderson Woods v. Khan*, 95 Ill.App.3d 1087, 51 Ill.Dec. 470, 420 N.E.2d 1028 (1981) (chicken manure); *Rust v. Guinn*, Ct.App. Ind., 429 N.E.2d 299 (1981) (chicken manure); *Valasek v. Baer*, Sup.Ct. Iowa, 401 N.W.2d 33 (1987) (hog manure); *Gee v. Dinsdale Bros., Inc.* 207 Neb. 224, 298 N.W.2d 147 (1980) (cattle manure).

Defendants also contend that this cause of action is precluded by the New York Right–to–Farm Law, Agric. & Mkts. L. § 308. This statute, which became effective on November 5, 1992, after this action was commenced, states that "an agricultural practice shall not constitute a private nuisance, when an action is brought by a person, provided such agricultural practice constitutes a sound agricultural practice pursuant to an

**1422**

opinion issued upon request by the commissioner." Defendants note that no such opinion has been requested or issued in this case. The statute, however, does not indicate that the issuance of such an opinion was intended to be a prerequisite to suit. In fact, the language, by describing the particular circumstance in which an agricultural practice will not be considered a nuisance, suggests that the burden is on the party pursuing the practice to show that it is sound.

### *CONCLUSION*

Plaintiffs' motion for leave to file a supplemental complaint is granted.

The motion by New York Farm Bureau, Inc., and American Farm Bureau for leave to file a brief as *amici curiae* is granted.

Defendants' motion for summary judgment is denied.

IT IS SO ORDERED.