**ATLANTIC STATES LEGAL FOUNDATION, INC.,**
Plaintiff,

v.

**EASTMAN KODAK COMPANY,**
Defendant.

No. 91–CV–6471T.

United States District Court, W.D. New York.

Dec. 28, 1992.

Charles M. Tebbutt, Allen, Lippes & Shonn, Buffalo, NY, for plaintiff.

Philip H. Gitler, Whiteman, Osterman & Hanna, Albany, NY, for defendant.

## DECISION AND ORDER

TELESCA, Chief Judge.

### INTRODUCTION

This action was commenced November 14, 1991, pursuant to § 505 of the Federal Water Pollution Control Act (the "Clean Water Act" or "Act"), as amended, 33 U.S.C.A. § 1365 (West 1986 and Supp. 1992), which authorizes citizens to commence actions ("citizens suits") against persons alleged to have violated "effluent standards or [other limitations on the release of pollutants into the nation's navigable waters]" established by the Act.

The plaintiff, Atlantic States Legal Foundation, Inc. ("Atlantic States"), is a not-for-profit corporation with its principal place of business in Syracuse, New York. Its members include residents of Rochester who either own property or use recreation facilities in or near the Genesee River and Paddy Hill Creek, which allegedly are affected by the discharges of pollutants from defendant Eastman Kodak Company, Inc. ("Eastman Kodak" or "Kodak") in violation of the Act. Atlantic States alleges that such discharges emanate from Kodak Park, one of defendant's major industrial facilities located in Rochester, New York.

Atlantic States has moved for partial summary judgment on the issue of the liability of defendant Eastman Kodak Company for violating the Clean Water Act by discharging, since April 1, 1990, one or more of 16 pollutants[1] into the water supply. Defendant Kodak has cross-moved for summary judgment dismissing the complaint on various grounds. Upon review of the Clean Water Act itself, its legislative history and current regulatory scheme, and the relevant case law, I find that, when an alleged polluter is subject to a pollution discharge permit issued pursuant to the Clean Water Act, a citizen suit under the Act against the polluter may only address discharges of pollutants expressly regulated by such permit. Accordingly, and for the reasons discussed below, plaintiff's motion is denied, defendant's cross-motion is granted, and the complaint dismissed in accordance with this decision.

## BACKGROUND

### The Earlier Action—"Kodak I"

Atlantic States commenced an earlier action against Kodak in August 1989.[2] That complaint alleged that New York State (the "State"), through its Department of Environmental Conservation ("DEC"), issued to Kodak a permit under the National Pollutant Discharge Elimination System pursuant to § 402(b) of the Act, 33 U.S.C. § 1342(b) (a "State NPDES Permit" or "SPDES Permit"). This SPDES Permit authorizes Kodak to discharge limited quantities of certain pollutants from its Kodak Park facility into both the Genesee River and the Paddy Hill Creek. The complaint alleged that Kodak's discharges of pollutants had exceeded the limitations of its

SPDES Permit on numerous occasions between March 1987 and May 1989. In a decision filed September 18, 1990, I dismissed *Kodak I* as precluded by a prior settlement with the State. On appeal, the Second Circuit vacated that dismissal and remanded *Kodak I* for a determination whether the prior settlement between Kodak and the State had "caused the violations alleged by Atlantic States to cease and eliminated any realistic prospect of their recurrence."[3]

After remand, Atlantic States moved pursuant to Fed.R.Civ.P. 15 to amend its complaint to include both violations of Kodak's SPDES Permit ("exceedances") which had occurred after the filing of the complaint and discharges by Kodak of pollutants which are not expressly mentioned in the SPDES Permit. In a decision filed September 27, 1991, I granted Atlantic States's motion insofar as it sought to include in the complaint more recent exceedances of the SPDES Permit and denied the motion insofar as it sought to include discharges of pollutants which are not mentioned in the Permit. *Kodak I* has since settled, and these discharges concerning pollutants not mentioned in Kodak's SPDES Permit form the basis of the complaint in the instant action (*"Kodak II"*).

### This Complaint

The complaint in *Kodak II* alleges that information submitted by Kodak in the form of "toxic chemical release forms" ("Form Rs")[4] establishes that Kodak is discharging pollutants which it is not authorized to discharge under its SPDES Permit, and that Kodak is, accordingly, violating both its Permit and the Act. Plaintiff seeks a declaration that these discharges

---

1. Namely, acetonitrile, acetone, dibutyl phthalate, diethanolamine, ethylene glycol. glycol ethers, manganese, methanol, methyl ethyl ketone, methyl isobutyl ketone, n-butyl alcohol, 1,1,1–trichloroethane, 1,2–trichloroethane, 1,4–dioxane, 2–methoxyethanol, and toluene.

2. *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co., Inc.,* 89–CV–1050 (*"Kodak I"*).

3. *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co., Inc.,* 933 F.2d 124, 128 (2d Cir.1991).

4. Form Rs are reporting devices which Kodak is required to submit to both the EPA and the State pursuant to § 313 of the Emergency Planning and Community Right–To–Know Act ("EP-CRA"), also known as Title III of the Superfund Amendments and Reauthorization Act ("SARA"), 42 U.S.C.A. § 11023 (West Supp. 1992).

violate the Clean Water Act; an injunction against Kodak's continuing discharge of these pollutants; mandatory disclosure to plaintiff by Kodak concerning its activities at Kodak Park relevant to these discharges; and both the maximum civil penalties permitted under the Act and attorney's fees.

### Plaintiff's Motion for Partial Summary Judgment

■ In its motion for summary judgment on the issue of Kodak's liability under the Act, Atlantic States relies almost exclusively upon information in Form Rs submitted by Kodak to both the United States Environmental Protection Agency ("EPA") and the State, and upon affidavits interpreting the significance of the Form Rs. Atlantic States argues that Kodak's Form Rs, submitted for the years 1989–1991, constitute admissions of violations of the Act sufficient to warrant granting of its motion.

Facilities, such as Kodak Park, which are known to have released toxic chemicals into the environment, must submit Form Rs annually. 42 U.S.C. § 11023(a). Form Rs contain detailed information concerning toxic discharges which occur in the normal course of a facility's business. While the Forms are based on chemicals known to be used and/or produced in the ordinary course of business, the information contained therein is essentially the result of a sophisticated process of estimation, including computer models, rather than of precise actual measurement. In this regard, and for purposes of a summary judgment motion, Form Rs differ significantly from the discharge monitoring reports ("DMRs") and non-compliance reports ("NCRs") which formed the basis of Atlantic States' complaint in *Kodak I.* DMRs and NCRs are regular reports of *actual* discharges which a permit holder is required to submit to both the state and the EPA. Courts have consistently found that undisputed

DMRs and NCRs constitute sufficient evidence of a permit holder's liability under the Act to warrant granting a motion for summary judgment on that issue. *See, e.g., Chesapeake Bay Found. v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451 (D.Md. 1985); *Nat. Resource Defense Council v. Texaco Refining,* 719 F.Supp. 281, 289 (D.Del.1989), *vacated in part on unrelated ground,* 906 F.2d 934 (3d Cir.1990); *cf. Friends of the Earth v. Facet Enterprises, Inc.,* 618 F.Supp. 532, 536 (W.D.N.Y.1984) (Summary judgment inappropriate when defendant disputes DMRs.) Thus, even if I were to consider the merits of plaintiff's motion for summary judgment, I would find that plaintiff's submission of Form Rs fails to establish by a preponderance that Kodak has violated the Act as alleged in the complaint.

### Defendant's Cross–Motion for Summary Judgment

Kodak does not directly oppose Atlantic States's summary judgment motion; it cross-moves for summary judgment on bases initially pled as affirmative defenses.[5] Kodak argues that this action should be dismissed because the complaint alleges discharges only of pollutants which are not expressly regulated by its SPDES Permit and that such discharges are not the proper subject of a citizen suit under the Clean Water Act. With respect to this argument Kodak relies almost exclusively on the EPA's interpretation of the Act as evidenced in various internal EPA memos.

Alternatively, Kodak argues that the Clean Water Act itself precludes this citizen suit, because it bars such suits when a state "has commenced and is diligently prosecuting an action under a [comparable] state law" and when a state "has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under ... [a] comparable state law." 33 U.S.C. § 1319(g)(6)(A). Kodak

---

5. Kodak's thirteenth affirmative defense states that "discharges of pollutants not specifically limited in the SPDES Permit by an effluent limitation for the specified chemical does not violate either the Act or the SPDES Permit."

Kodak's fourteenth affirmative defense states that the instant citizen suit is precluded by the Consent Order entered into between Kodak and the State, effective April 1, 1990.

argues that the same Consent Order which formed the basis for this Court's dismissal of *Kodak I* also precludes the instant suit. If I were to reach this alternative argument, I would, on the basis of the record before me, be obliged to deny the motion, because disputed issues of fact remain as to whether Kodak's settlement with the State has actually "caused the violations alleged by Atlantic States to cease and eliminated any realistic prospect of their recurrence." *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co., Inc.*, 933 F.2d at 128.

As discussed below, these motions turn on the meaning of the relevant provisions of the Act, a meaning which emerges only upon reading the provisions conjunctively and in light of both the Act's legislative history and its regulatory scheme.

## DISCUSSION

### *Relevant Provisions of the Clean Water Act*

### *The Citizen Suit Provision— 33 U.S.C. § 1365*

■ The citizen suit provision under which Atlantic States sues is found in 33 U.S.C. § 1365, which provides that

... any citizen may commence a civil action on his own behalf—

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under [the Act] or (B) an order issued by ... a State with respect to such a standard or limitation ...

This citizen suit provision is modeled after a similar provision in the Clean Air Act, and they "share the common central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 62, 108 S.Ct. 376, 384, 98 L.Ed.2d 306 (1987). In providing for citizen suits under these Acts, "Congress [has] made clear that citizen groups are not to be treated as nuisances or trou-

blemakers, but rather as welcomed participants in the vindication of environmental interests." *Friends of the Earth v. Carey*, 535 F.2d 165, 172 (2d Cir.1976) (Clean Air Act); *see also Friends of the Earth v. Conrail Corp.*, 768 F.2d 57, 63 (2d Cir. 1985) (Clean Water Act).

Notwithstanding the importance of citizen suits, the Act imposes certain restrictions on their commencement and prosecution, 33 U.S.C. § 1365(b)(1)(A)–(B), which restrictions reflect the fundamental purpose of citizen suits under the Act: They are "meant to *supplement* rather than to supplant governmental action." *Gwaltney*, 484 U.S. at 60, 108 S.Ct. at 383, emphasis added. The citizen suit is intended as a remedy to pollution of which the appropriate governmental agencies have knowledge and which they have taken no meaningful action to abate.

### *The Purpose of the Act and Its General Prohibition on Pollution—33 U.S.C. § 1311*

The first section of the 1972 amendments to the Federal Water Pollution Control Act (the "Clean Water Act" or the "Act") declares the congressional intent of the legislation: [T]o restore and maintain the chemical, physical, and biological integrity of the Nation's waters [one goal of which is] that the discharge of pollutants into the navigable waters be eliminated by 1985[.]" 33 U.S.C. § 1251(a), (a)(1). In furtherance of this goal, the Act makes unlawful the discharge of any pollutants into the nation's navigable waters except as authorized by specified sections of the Act. *See* 33 U.S.C. § 1311(a).[6]

The language of § 1311(a) is plaintiff's first line of defense against this motion; on its face it appears to prohibit any discharge of a pollutant which is not in compliance with certain other sections of the Act. Plaintiff argues that § 1311(a)'s prohibition certainly extends to a permit holder's discharge of a pollutant which is either (i) in excess of the limitation set by the permit or

---

**6.** "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful."

(ii) not mentioned, i.e., not permitted, by the permit. Plaintiff's argument relies heavily on a case from the Northern District of New York, *Atlantic States Legal Foundation v. Reynolds Metals Co.*, 31 E.R.C. 1156 (1990), in which the court held that a permit holder violated the Act when it discharged a pollutant (PCBs) not referenced in its permit. *Id.* at 1158. This interpretation of § 1311(a) cannot be sustained, however, when that section is viewed in the larger context of the Act itself.

### The Purpose of the Act and the NPDES/SPDES Provision— 33 U.S.C. 1342

Prior to the enactment of the 1972 amendments, the Clean Water Act had emphasized improving water quality rather than preventing water pollution. Water quality standards had been set

> to serve both to guide performance by polluters and to trigger legal action to abate pollution, . . . .
>
> . . . [These] standards . . . focused on the tolerable effects rather than the preventable causes of water pollution. . . .

*EPA v. California*, 426 U.S. 200, 202, 96 S.Ct. 2022, 2023, 48 L.Ed.2d 578 (1976).

The 1972 amendments to the Act were an express acknowledgement that water quality standards had not proven effective in eliminating water pollution, *Id.*, 426 U.S. at 202–03, 96 S.Ct. at 2023–24, and

> introduced [ ] major changes in the methods to set and enforce standards to abate and control water pollution. [D]irect restrictions on discharge facilitate enforcement by making it unnecessary to work backward from an over-polluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based [restrictions]—specified levels of treatment—to which it must conform, rather than against limitations derived from water quality standards to

which it and other polluters must collectively conform.

Second, the amendments establish[ed] the National Pollutant Discharge Elimination System (NPDES) as a means of achieving and enforcing the [new restrictions]. Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms. An NPDES permit serves to transform generally applicable [restrictions]—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the amendments provide[d] for direct administrative and judicial enforcement of permits. *Id.*, 426 U.S. at 204–05, 96 S.Ct. at 2024–2025, citations and footnotes omitted.

The single most significant change effected in the Clean Water Act by the 1972 amendments is their "primary reliance on the NPDES as a means to abate and control water pollution [which effectively makes NPDES/SPDES permits] the principal means of enforcing the [Act's] pollution control and abatement provisions." *Id.*, 426 U.S. at 223, 96 S.Ct. at 2033. Given this focus on the SPDES permit, a citizen suit brought against a permit holder such as Kodak "will necessarily be brought [to enforce the permit or a condition thereof and] **unless the plaintiff can show a violation of the permit condition, violation of [the Act as amended] cannot be established.**" *Id.*, emphasis added. Thus, I find that Kodak's liability in this case must be determined in light, not of the Act's general prohibition of the discharge of pollutants, 33 U.S.C. § 1311(a), but of the conditions of Kodak's SPDES Permit.[7]

■ Atlantic States counters that, even if the alleged discharges are evaluated *solely* under Kodak's Permit, and *not* under the general prohibition against the discharge of pollutants at § 1311(a), they constitute a violation of the Act. Plaintiff's argument is syllogistic: Every violation of

---

7. The SPDES Permit presently in effect at Kodak Park is the permit issued in October 1984 with an effective date of November 1, 1984. By its terms, this Permit would have expired Nov.

1, 1989. At that time, and continuing to date, Kodak's application to renew its permit is pending, and the 1984 Permit remains in effect.

a permit is a violation of the Act; Kodak violated its Permit when it discharged unlisted pollutants; therefore, Kodak violated the Act. At the heart of these motions, then, is the scope of a SPDES permit under the Act: Whether a permit prohibits *only* discharges of pollutants which it expressly restricts and only when they are discharged in excess of the levels permitted in the permit, or whether a permit prohibits every single discharge *except* those in express compliance with the limits imposed by the permit. The Act, its administrative framework, and its legislative history require the adoption of the former interpretation.

In relevant part, 33 U.S.C. § 1342 provides that a permit[8] may be issued

> For the discharge of any pollutant, or combination of pollutants, notwithstanding § 1311(a) of this Title, upon condition that such discharge will meet either (A) all applicable requirements under §§ 1311, 1312, 1316, 1317, 1318, and 1343 of this Title, or (B) prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the administrator determines are necessary to carrying out the provisions of this Chapter.

33 U.S.C.A. § 1342(a)(1). (West Supp. 1992).

Thus, the Act expressly authorizes the issuance of a SPDES permit, **"notwithstanding § 1311(a) of this Title[.]"** (Emphasis added.) While this language of the statute indicates that discharge of a pollutant by the holder of a SPDES permit is not to be considered under § 1311(a)'s general prohibition of all discharges of pollutants, it does not definitively resolve the issue of the scope of such a permit.

Section 1342 is certainly one more "provision in which Congress' limpid prose [does not] put [ ] an end to all dispute." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 57, 108 S.Ct. 376, 381, 98 L.Ed.2d 306 (1987) (noting the

---

**8.** The Act provides for the issuance of both National Pollution Discharge Elimination System permits ("NPDES") and State Pollution Discharge Elimination System permits ("SPDES").

ambiguity of the language of 33 U.S.C. § 1365, the Clean Water Act citizen suit provision.) Nevertheless, merely "to acknowledge ambiguity is not to conclude that all interpretations are equally plausible." *Id.* As discussed earlier, NPDES/SPDES permits are "the principal means of enforcing the [Clean Water Act's] pollution control and abatement provisions." *EPA v. California*, 426 U.S. at 223, 96 S.Ct. at 2033. The Act itself, *see* 33 U.S.C. § 1342, and the regulations promulgated thereunder, *see* 40 C.F.R. § 122.41 *et seq.* (1991), prescribe such detailed and involved procedure for the establishment of discharge limits under permits, that it strains all credulity to propose that Congress, having enacted such detailed legislation, and having authorized the EPA to adopt such detailed regulations, could have contemplated that a discharge by a permit holder of a pollutant *never even referenced in its permit* would form the basis of a permit violation cognizable under the Act's citizen suit provision. In coming to this conclusion, I acknowledge that it is nowhere explicitly stated in the Act itself. Nevertheless, I find that this interpretation comports not only with the statutory scheme of the Act but also with its legislative history.

### Relevant Legislative History

Senate Report 92–414 discusses at some length the parameters of a citizen suit under the Act:

> [The citizen suit provision] would not substitute a "common law" or court-developed definition of water quality. An alleged violation of an effluent control limitation or standard, (sic) would not require reanalysis of technological in (sic) other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section.

As previously discussed, Kodak Park is currently operating under a SPDES permit. Any differences between the permits are not relevant to this discussion.

S.Rep. No. 92–414, 92d Cong., 2d Sess. 1972, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3745 (1972).

The Senate Report further provides that: [w]hether abatement is sought by an agency or by a citizen, there should be a considerable record available to the courts and any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures. Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been compliance.

*Id.* at 3746.

The Senate Report further reflects Congress's understanding that, "[u]nder the Bill, citizens themselves may go to United States District Courts against those who violate effluent standards or compliance orders." *Id.* at 3677.

There is simply no reconciling this legislative history with plaintiff's broad interpretation of the permit scheme as sweeping within its regulation not only those pollutants which were considered throughout the administrative procedure of issuing permits, but also *any other* discharge of pollutants. *See also U.S. v. Hooker Chemicals and Plastics Corp.*, 749 F.2d 968, 979–80 (2d Cir.1984); *State of New York v. U.S.*, 620 F.Supp. 374, 383–85 (E.D.N.Y.1985) (citizen suits must concern violations of standards *already* established administratively.)

### Relevant Administrative Regulations

Finally, as Kodak vigorously argues, the EPA itself has recognized that "a permittee may discharge a . . . pollutant not limited in its permit, and EPA will not be able

to take enforcement action against the permittee as long as the permittee complies with the notification requirements of [the regulations]." 45 Fed.Reg. 33516, 33523 (May 19, 1980). This view is confirmed by various internal EPA memoranda submitted by Kodak in support of this motion, and plaintiff has provided no evidence of any contrary position on the part of the EPA.

Atlantic States argues that, insofar as this regulation and the agency internal memoranda would preclude this citizen suit, they contradict the Clean Water Act on its face and are accordingly unreasonable and unenforceable. Atlantic States's challenge to the reasonableness of the EPA's position is founded on the Act's general prohibition against the discharge of pollutants, 33 U.S.C. 1311(a). As previously discussed, however, the statutory and regulatory scheme of the Act takes enforcement actions against permit holders *outside* that general prohibition, and I have neither found nor been cited to any language in the Act or in the applicable case law which would render unreasonable the EPA's view on this issue. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).[9]

### Alternative Bases for Liability Under the Act

■ Atlantic States alternatively argues that New York Environmental Conservation Law § 17–0815(3) and the corresponding language in Kodak's SPDES Permit provide bases for this citizen suit. Section 17–0815(3) requires New York State SPDES permits to include the provision that "the discharge of any pollutant not identified and authorized by such permit

---

9. "When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not

simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. . . . [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

... shall constitute a violation of the permit[.]" General Condition 1(b) of Kodak's SPDES Permit incorporates that requirement.

Kodak argues, however, that federal regulation precludes enforcement under the Act and its regulatory scheme of restrictions which are broader in scope than federal law requires; that General Condition 1(b) of Kodak's Permit *is* broader in scope than is required under the Act; and that General Condition 1(b) is, therefore, not part of a program enforceable under the Act. *See* 40 C.F.R. 123.1(i)(2) (1991) (Where "an approved State program has greater scope of coverage than required by Federal law the additional coverage is not part of the Federally approved program.")

Atlantic States counters that the requirements of N.Y.E.C.L. § 17–0815(3) are not *broader*, but only *stricter*, than the express conditions of Kodak's permit, and that such stricter enforcement is contemplated by both 33 U.S.C. § 1342 and the regulations promulgated thereunder, *see* 40 C.F.R. 123.1(i)(1) ("Nothing ... precludes a State from [a]dopting or enforcing requirements which are more stringent or more extensive than those required under [federal regulation.]" Such a view would, indeed, permit imposition of liability under the Act against a permit holder for the discharge of pollutants not expressly regulated by such permit, and not only for the discharge of regulated pollutants in excess of any limits established either by permit or by federal law or regulation.

Neither linguistic analysis nor logic supports Atlantic States's interpretation of N.Y.E.C.L. § 17–0815(3) as merely a stricter version of the applicable federal law and regulations. Imposing liability for *any* discharge of a pollutant, whether it has been the subject of the administrative permit procedure or not, would clearly broaden the parameters of enforcement of a citizen suit under the Act. That kind of expansion is simply not cognizable under the Act and the applicable case law. *See McClellan Ecological Seepage Situation (MESS) v. Weinberger*, 707 F.Supp. 1182, 1199 (E.D.Cal.1988), and cases cited *supra* at

1047. (Citizen suits limited to seeking enforcement of *administratively* established "effluent standards or limitations.")

### CONCLUSION

The abatement of *all* contamination of our precious water supply by pollutants is the goal of the Clean Water Act. Congress chose to effect that goal through a permit system which is founded on the administrative determination of levels of pollution which are, given our present state of technological knowledge, acceptable or unacceptable. Plaintiff's frustration with this system, and with the level of pollution discharge it continues to permit, is understandable. Nevertheless, accepting plaintiff's view of the reach of the Act would effectively circumvent the permit system and expand the scope of a citizen suit under the Act; it "would change the nature of the citizens' role from interstitial to potentially intrusive." *Gwaltney*, 484 U.S. at 61, 108 S.Ct. at 383. I cannot agree that Congress intended such a result.

WHEREFORE, plaintiff's motion for partial summary judgment is denied; defendant's cross-motion for summary judgment is granted; this case is dismissed.

ALL OF THE ABOVE IS SO ORDERED.