The CITY OF NEW YORK, Plaintiff,

v.

ANGLEBROOK LIMITED PARTNER-
SHIP; Somers Golf Associates; Mitsui
Fudosan (New York), Inc.; Kajima In-
ternational, Inc.; Doe 1 and Doe 2, De-
fendants.

No. 94 Civ. 7215 (BDP).

United States District Court,
S.D. New York.

Jan. 3, 1995.

Philip M. Bein, Hilary Brest and Michael
Bogin, New York City Law Dept., Office of
The Corp. Counsel, New York City, for plain-
tiff.

Henry M. Hocherman, Adam L. Wekstein,
P. Daniel Hollis III and Kan Morimoto,
Shamnberg Marwell Cherneff Hocherman
Davis & Hollis, Mt. Kisco, NY, for defen-
dants.

## MEMORANDUM AND ORDER

PARKER, District Judge.

This action is a citizen suit brought by the
City of New York ("the City") under § 505 of
the Water Pollution Control Act ("the Clean
Water Act" or "the Act"), 33 U.S.C. §§ 1251–
1386, against Defendants Anglebrook Limit-
ed Partnership, Somers Golf Associates, Mit-
sui Fudosan (New York), Inc., Kajima Inter-

national, Inc., Doe 1 and Doe 2 ("Defendants").

The complaint alleges that Defendants' plans for the construction and operation of a golf club in northern Westchester County violate the Clean Water Act because they fail to meet numerous requirements of the "New York State Department of Environmental Conservation State Pollution Discharge Elimination System General Permit for Storm Water Discharges from Construction Activities," Permit No. GP 93–06 ("SPDES" or "General Permit"). The case is presently before the court on Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6). For the reasons stated below, the motion is denied.

### I.  BACKGROUND

Defendants are various entities owned directly or indirectly by Mitsui Fudosan (New York), Inc. and Kajima International, Inc. The golf club is a project of defendant Anglebrook Limited Partnership, which is an affiliate of Somers Golf Associates ("SGA"). SGA is a partnership of defendants Mitsui Fudosan (New York) Inc. and Kajima International Inc. Does 1 and 2 are general partners of Anglebrook. Anglebrook and its partners are subsidiaries of the partners of SGA and are controlled by SGA.

Defendants intend to build a private golf club on a 240 acre site in Somers, New York, immediately adjacent to the City's Amawalk Reservoir and two to three miles upstream of the City's Muscoot Reservoir. Two streams, the Angle Fly Brook and a tributary of the Plum Brook, pass through the site; each provides water to the Muscoot Reservoir. The Muscoot and Amawalk constitute the City's Croton water supply system. The Croton water system is a significant source of the City's water supply system which services the nearly nine million New York City area residents.

### A.  The Clean Water Act

The Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. §§ 1251–1386 (1986 & Supp. I 1994). The Act prohibits discharge of any pollutants into the nation's waters except pursuant to specific authorization under the Act 33 U.S.C. § 1311(a). Pursuant to § 402(a), National Pollutant Discharge Elimination System (NPDES) permits can be issued to particular entities, allowing them to discharge limited amounts of pollutants into surface waters. 33 U.S.C. § 1342(a). Further, § 402(b) permits each state to implement the Clean Water Act through its own permit program as long as the program conforms to federal guidelines approved by the EPA administrator. 33 U.S.C. § 1342(b). The EPA administrator has authorized the Department of Environmental Conservation ("the DEC") in the State of New York to issue and enforce discharge permits.

The holder of a state NPDES permit is subject to both state and federal enforcement actions for failure to comply with its permit. 33 U.S.C. §§ 1319, 1342(b)(7). In the absence of federal or state enforcement, private citizens may commence civil actions under § 505 against any person alleged to be in violation of an effluent standard or limitation. 33 U.S.C. § 1365(a)(1). Section 505 defines an effluent standard or limitation to include, among other things, the discharge of any pollutant except as provided for in the Act and a violation of a permit or condition the Act. 33 U.S.C. § 1365(f)(1), (6). If the citizen prevails in an enforcement action, the court may enforce the effluent standard or limitation, order injunctive relief, and impose civil penalties. 33 U.S.C. § 1365(a).

In 1987, Congress amended the Clean Water Act to address the threat of pollution carried into nearby surface waters, such as drainage systems, streams and reservoirs, by stormwater runoff. Among other things, pollutants from stormwater runoff can result in the deterioration of local water supply systems. Under the new regulations, discharge resulting from commercial or industrial activities which disturb more than five acres of land require a permit. 33 U.S.C. § 1342(p).

In New York the DEC issued the DEC State Pollution Discharge Elimination System General Permit for Stormwater Construction Activities, permit GP–93–06 ("the General Permit") in 1993. The General Per-

mit requires that permittees prepare a Stormwater Pollution Prevention Plan ("SWPPP") which must include detailed descriptions of plans for erosion and sediment controls, monitoring, and recordkeeping.[1]

The General Permit prohibits all discharges associated with industrial activity that it does not expressly authorize. The General Permit enforces these standards by a Duty to Comply Requirement, which obligates owners to comply with terms of the SWPPP. Under the Permit, "Any [P]ermit noncompliance constitutes a violation of the Clean Water Act ... and is grounds for an Enforcement Action." GP–93–06 § VA.

The General Permit requires that any person intending to "disturb five or more acres of land must submit a Notice of Intent ("NOI") to be in accordance with the requirements of [the General Permit] at least two days prior to the commencement of construction activities." GP–93–06 § IE. The General Permit further requires that the permittee submit a copy of the SWPPP to the local governing body and "any other authorized agency having regulatory control over the construction activity." GP–93–06 § IIIA.

## B. *Project History*

This is not the first proceeding in which the City has expressed its objections to Defendants' project, and, in particular, to its potential impact on the City's water supply. For the past three years, the City has opposed Defendants' plans in various environmental proceedings. The golf club has previously undergone a full environmental review pursuant to the State Environmental Quality Review Act. Defendants have submitted a Draft Environmental Impact Statement and a Final Environmental Impact Statement in July, 1991. The golf club was also reviewed by the Town of Somers Planning Board which granted preliminary approval in December 1991 and final approval in November 1993. The Somers Zoning Board of Appeals granted Defendants a zoning variance in June 1992.

In addition to the approval of agencies of the Town of Somers, the golf project needed to obtain several state permits, including a state wetlands permit from the DEC since the runoff from the construction activity would pass through a wetlands area before reaching the streams and reservoirs. The City opposed Defendants' application for a wetlands permit, contending, in large part, that it did not include adequate erosion and sedimentation control measures and did not properly address the problem of stormwater runoff. Notwithstanding the City's opposition, on May 10, 1993, the DEC issued Defendants a Wetlands Permit and other state permits, including a Protection of Waters Permit under Article 15 of the New York State Environmental Conservation Law and a Water Quality Certificate under Section 401 of the Clean Water Act. 33 U.S.C. § 1341.

Subsequently, the City appealed the May 10, 1993 decision to the New York State Freshwater Wetlands Appeals Board ("the FWAB"). The FWAB hearings reviewed the potential adverse impact of construction activities on adjacent wetlands. The City presented its criticisms of Defendants' SWPPP. Defendants' engineer, Gerhard Schwalbe, testified by affidavit dated December 17, 1993, and addressed the City's criticisms of the SWPPP and contended that it conformed to applicable regulations, and in particular to New York's General Permit.[2] The FWAB affirmed the DEC's decision, but it did not have jurisdiction to consider the City's objections under the Clean Water Act.

## C. *The Notice Letter*

On March 29, 1994, the City sent Defendants a Notice of Intent to Sue letter ("the Notice Letter") under 33 U.S.C. § 1365(b)(1)(A) which requires sixty days notice of an alleged violation as a condition precedent to a citizen suit. See *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). The Notice

---

1. The DEC's permit imposes the same obligations on the permittee as the EPA permit. 57 Fed.Reg. 44412, 22 ("Standard Permit Conditions").

2. Affidavit of Gerhard Schwalbe, sworn to December 17, 1993 ¶¶ 18–20 (Attached as Exhibit B to the Affidavit of Philip M. Bein, sworn to October 31, 1994).

Letter, captioned "Notice of Intent to Sue for Clean Water Violations", noted that the General Permit identified deficiencies in Defendants' SWPPP and contended that the SWPPP, as it existed at that time, would violate the General Permit and pose a threat of contamination to the City's water supply. Specifically, the City noted that Defendants' SWPPP did not contain requisite descriptions of its water quality standards, stormwater controls, erosion and sedimentation controls, maintenance procedures, and stormwater management practices.

On September 16, 1994, Defendants filed a "Notice of Intent" ("NOI") with a statement that construction would commence on September 20, 1994 pursuant to the General Permit. The Defendants also filed an amended SWPPP. Because of the pendency of this lawsuit, construction has not begun.

### D. *Procedural History*

The City filed its complaint on October 5, 1994, alleging two claims. The first is that Defendants' SWPPP, dated September 16, is inadequate and therefore violated the General Permit. Its second claim is that once construction has begun, stormwater discharge will constitute additional violations of the Act.

On October 13, 1994, Judge Whitman Knapp issued a temporary restraining order enjoining the commencement of construction pending a hearing on the City's motion for a preliminary injunction. By notice of motion dated October 24, 1994, Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint on the ground that it has failed to state a claim because it did not allege an unlawful discharge of a pollutants. Defendants have also moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) on the ground that this court lacks subject matter

jurisdiction because the City failed to comply with the Act's 60–day notice requirement. The City's application for a preliminary injunction was stayed pending the determination of the motions to dismiss. We consider these arguments in turn.

## II. DISCUSSION

### A. *Failure to State A Claim*

■ Defendants contend that because construction activity has not commenced, there has been—and can be—no violation of the Act since it is never violated except where there has been "the discharge of [a] ... pollutant" as proscribed by § 301(a). This reading of the statute, according to the Defendants, means that alleged facial inadequacies of a SWPPP are never actionable until there is construction activity, followed by the discharge of a pollutant, followed by a 60–day notice letter and an opportunity to cure. While there is a certain logic to the contention that the Clean Water Act contemplates litigation over water quality as opposed to paper quality, the problem is that the text of the statute precludes this result.

#### 1. *Statutory Interpretation*

The starting point for our analysis is the text of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The provision under which the City sues, 33 U.S.C. § 1365, provides that

... any citizen may commence a civil action on his own behalf—

(1) against any person who is alleged to be in violation of (A) an effluent standard or limitation under [the Act].

33 U.S.C. § 1365. Section 1365(f) enumerates seven types of standards.[3] Standard six is a violation of "a permit or condition thereof issued under section 1342 of this title ..."

---

3. That section provides in full:

For purposes of this section, the term "effluent standard or limitation under the act" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard or performance under section 1316 of this title; (4) prohibition, effluent standard, or

pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; (6) a permit or condition thereof issued under section 1342 of this title which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title); or (7) a regulation under section 1345(d) of this title.
33 U.S.C. 1365(f)

33 U.S.C. § 1365(f)(6). The City claims that even if no construction activity has begun or no stormwater runoff has occurred, a facially inadequate SWPPP is a violation of § 1342 since it necessarily violates the terms of the SPDES permit issued under that section.[4]

Defendants contend that all violations of 1365(f) are qualified by the provision of § 1311(a) requiring the discharge of a pollutant as a predicate to liability. But this conclusion is unsupported by the text of the statute which implicitly provides that—apart from an actual discharge prohibited in 1365(f)(1)—violation of an effluent standard occurs when there is a violation of a permit or a condition of a permit. See § 1365(f)(6). Section 1365(f) provides for other types of violations which do not necessarily involve the discharge of pollutants. Section 1365(f)(5), for example, adverts to violations of § 1341, a requirement for state environmental approval of proposed water projects.[5]

State approval under this Section is needed well in advance of construction, let alone the discharge of any pollutant. *Keating v. F.E.R.C.*, 927 F.2d 616, 619 (D.C.Cir.1991).

Moreover, Defendants' interpretation of the Section undermines the significance of the establishment of the NPDES and SPDES, the national and state permit systems, as a means to abate and control water pollution. See *EPA v. California*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976) ("The permit defines and facilitates compliance with, and enforcement of [the Act]."). See also Laws, "The National Pollution Discharge Elimination System," in *The Clean Water Handbook* 105 (3d Ed.1993) ("the backbone of the Clean Water Act . . . is the [NPDES] permit system"). Given this focus on the enforcement value of a SPDES, violations of the Clean Water Act "must be determined in light, not of the Act's general

**4.** Defendants assert that *Atlantic States Legal Foundation v. Eastman Kodak*, 12 F.3d 353 (2nd Cir.1993), *amended*, 1993 U.S.App. LEXIS 35911, *cert. denied* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 19 (1994) mandates dismissal of this action. There, the Second Circuit held that the district court lacked jurisdiction in a citizen suit where plaintiffs sought to enforce a state permit requirement that was stricter than the Clean Water Act and its implementing regulations. In that case, citizen plaintiffs sought to enjoin defendants from discharging pollutants for which it was not authorized. Specifically, plaintiffs argued that a provision of the New York permit, stricter than its national counterpart, prohibits discharge of all pollutants not specifically assigned effluent limitations in either the SPDES or the NPDES permit. The court acknowledged that the states may enact stricter standards for wastewater than those mandated by the Clean Water Act. However, enforcement of those strict standards is limited to the State or the EPA. *Kodak*, 12 F.3d. at 358, citing *United States Dep't of Energy v. Ohio*, 503 U.S. 607, 624, 112 S.Ct. 1627, 1638, 118 L.Ed.2d 255 (1992) (punitive damage awards authorized under state regulations and approved by and supplanting the EPA did not arise under Federal Law and thus could not be enforced under 33 U.S.C. § 1319). However, because New York's General Permit virtually mirrors the EPA's General Permit with respect to SWPPP's, *Kodak* is inapplicable.

**5.** That provision provides in relevant part:

Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities,

which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b) and 1312 of this title, and there is not an applicable standard except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

prohibition of the discharge of pollutants ... but of the conditions of [Defendants'] permit." *Atlantic States Legal Foundation v. Eastman Kodak,* 809 F.Supp. 1040, 1045 (W.D.N.Y.1992) *aff'd,* 12 F.3d 353 (2d Cir. 1994), *cert denied,* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 19 (1994).

## 2. *Requirement of an Ongoing Violation*

The Defendants contend that because *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), establishes that a citizen suit may not be based solely on anticipated violations of the Act, no claim is stated where no pollutant has been discharged. *Gwaltney* held that citizen suits may not be predicated wholly on past violations and require allegations of current violations of the statute or of past violations likely to recur. *Gwaltney,* 484 U.S. at 63, 108 S.Ct. at 384, 98 L.Ed.2d 306. We are not persuaded that *Gwaltney* is controlling because here the City claims a present violation—a flawed plan filed in violation of permit requirements—that is an actionable violation of an effluent standard under § 1365(f)(6).

## 3. *The Clean Air Act*

Finally, while it appears that no court has had the opportunity specifically to decide whether a flawed SWPPP can form the basis of a citizen suit under the Clean Water Act, courts within this Circuit have held that inadequate plans in the absence of any polluting event may be the basis for a citizen suit under the Clean Air Act. *Coalition Against Columbus Center v. City of New York,* 967 F.2d 764 (2d Cir.1992) (holding that citizens suit appropriate to enjoin construction where development plan failed to identify carbon monoxide mitigation measures under New York's SIP); see also *Atlantic Terminal Urban Renewal Area Coalition v. New York*

*City Dep't of Environmental Protection,* 697 F.Supp. 157, 162–63 (S.D.N.Y.1988); *Wilder v. Thomas,* 659 F.Supp. 1500, 1506–07 (S.D.N.Y.1987), *aff'd on other grounds,* 854 F.2d 605 (2d Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989).[6] These decisions teach that citizens may sue under the Clean Air Act for a violation of an emission standard or limitation as long as plaintiffs allege a specific violation of a specific strategy or commitment in the State Implementation Plan ("SIP") and describe with some particularity the respects in which prospective compliance with the provision is deficient.

As the Supreme Court emphasized in *Gwaltney,* the citizen suit provision in the Clean Water Act is an analogue of the one in the Clean Air Act. 484 U.S. at 62, 108 S.Ct. at 383 ("[c]itizen participation under the Clean Water Act is 'modeled' on the provision enacted in the Clean Air Act Amendments ... [and] follows the concepts utilized in [that section] of the Clean Air Act") (citations omitted); See also *Atlantic States Legal Foundation, Inc. v. Eastman Kodak Company,* 809 F.Supp. 1040, 1044 (W.D.N.Y. 1992) *aff'd,* 12 F.3d 353 (2d Cir.1994), *amended,* 1993 U.S.App. LEXIS 35911, *cert. denied* —— U.S. ——, 115 S.Ct. 62, 130 L.Ed.2d 19; *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 17 (D.C.Cir.1976), *cert. denied* 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) ("because of their contemporaneous enactment, interpretations of provisions of one Act have frequently been applied to the comparable provision of the other"); *Natural Resources Defense Council v. Train,* 510 F.2d 692 (D.C.Cir.1975). Like the SIP, the NPDES imposes regulatory and enforcement standards on polluters, and so Clean Air Act precedent is relevant. See

---

33 U.S.C. § 1341.

**6.** The citizen suit section in the Clean Air Act provides in pertinent part:

[A]ny person may commence a civil action on his own behalf—(1) against any person ... who is alleged to be in violation of (A) an emission standard or limitation under this chapter....

42 U.S.C. § 7604(a)(1). The Act defines an "emission standard or limitation" as:

(3) ... any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements ... or under an applicable implementation plan.

*California Public Interest Research Group v. Shell Oil,* 840 F.Supp. 712 (N.D.Cal.1993).[7]

In deciding whether citizens have stated a claim under § 1365, we are inclined to borrow the approach of the Clean Air Act, which requires: (1) an allegation of a specific permit violation and (2) a description with some particularity of the respects in which compliance with the permit is deficient.

In its complaint, the City asserts that Defendants have violated the permit requirements with respect to a SWPPP. Specifically, the City has alleged that Defendants' SWPPP is flawed because of deficient descriptions of stormwater, erosion and sedimentation controls, permit standards, maintenance procedures and stormwater management practices. The City's allegations of Defendants' permit violations are therefore sufficient to state a claim under § 1365.

## B. *The Notice Requirement*

Defendants also contend that this court lacks subject matter jurisdiction because the City has failed to comply with the notice requirements of 33 U.S.C. § 1365. That section prohibits suit "(A) prior to sixty days after the plaintiff has given notice of the alleged violation...."

Defendants claim that the City's Notice Letter is insufficient because it fails to allege an ongoing violation which requires an actual discharge. In support, Defendants cite *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) which involved an analogous notice provision in the Resource Conservation and Recovery Act ("RCRA").[8] In *Hallstrom,* the Supreme Court held that the "notice and 60–day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision."[9] *Hallstrom* has subsequently been applied to Clean Water Act cases. See, e.g, *National Environmental Foundation v. ABC Rail Corp.,* 926 F.2d 1096, 1097 (11th Cir.1991) ("the 60–day notice requirement of 33 U.S.C. § 1365(b) is a mandatory condition precedent to the filing of the citizen suit under the Clean Water Act").

Specifically, Defendants contend that because a flawed SWPPP in the absence of any discharge of pollutants is not a violation of the act, the City has failed to allege an ongoing violation. However, because we have determined that a violation of a permit requirement is, in itself, an independent basis for a citizen suit, notice of a flawed SWPPP is notice of an ongoing violation.

In addition, however, Defendants contend that the City's Notice Letter is inadequate because it responded to an SWPPP filed in March but which was replaced in September—six months after the March Notice Letter was sent. Because no new notice followed the September NOI, reason the Defendants, no prior 60–day notice was given and no subject matter jurisdiction exists.

As mentioned above, the City's Notice Letter alleged violations of the SWPPP that had been submitted in the FWAB hearings. In its March Notice Letter, the City set forth

42 U.S.C. § 7604(f)(3).

**7.** Not surprisingly, the same congressional committees and leaders were instrumental in drafting both statutes. See W.H. Rodgers, *Environmental Law: Air and Water* 6–7 (1986). See also, *Train,* 510 F.2d at 699, n. 34 *citing,* S.Rep.No.414, 92d Cong., 1st Sess. 79 (1971), U.S.Code Cong. & Admin.News 1972, p. 3745, *reprinted* in Environmental Policy Division of the Congressional Reference Service, a Legislative History of the Water Pollution Control Act Amendments of 1972, Vol. II at 1497 (Senate Public Works Comm. Print 1973); see H.R.Rep. No.911, 92d Cong., 2d Sess. 133 (1972), reprinted in Legislative History, supra, Vol. I at 820. Compare 33 U.S.C. § 1365 (Supp. II 1972) with 42 U.S.C. § 1857h–2 (1970).

**8.** RCRA provides that "No action may commenced ... prior to sixty days after the plaintiff

has given notice of the violation...." 42 U.S.C. § 6972(b)(1).

**9.** Whether defective notice is jurisdictional or merely procedural has received mixed treatment. In *Hallstrom, supra,* the Supreme Court dismissed a citizen suit based on deficient notice but it stated that "we need not determine whether [the notice provision] is jurisdictional in the strict sense of the word." *Hallstrom,* 493 U.S. at 31, 110 S.Ct. at 311. Some subsequent decisions have interpreted the provision as jurisdictional. *Bettis v. Town of Ontario,* 800 F.Supp. 1113, 1115 (W.D.N.Y.1992). Other decisions have held that the requirement is "a mandatory condition precedent to the filing of a citizen suit under the Clean Water Act." *National Environmental, supra,* 926 F.2d at 1097. Because we conclude that the City's notice was adequate, we do not attempt to resolve this issue.

five categories of permit violations within Defendants' SWPPP, namely: (1) its failure to ensure maintenance of water quality standards in downstream waters; (2) its failure to describe appropriate controls and measures to be implemented at the construction site; [10] (3) its failure to set forth erosion and sediment control measures; [11] (4) its failure to describe stormwater management controls; [12] and (5) its failure to describe adequate maintenance procedures. For each category, the City referred to the corresponding sections, paragraphs and subparagraphs of the General Permit. See notes 8–10, supra.

The complaint alleges. Defendants' violations of SWPPP requirements with respect to its Notice of Intent of September 16, 1994. In its complaint, the City alleged that Defendants' revised SWPPP violated the five following categories of conditions: (1) failure to describe its stormwater controls; [13] (2) failure to describe the erosion and sedimentation controls to be used on the site; [14] (3) failure to describe stormwater management practices that Defendants plan to implement; [15] (4) failure to describe adequate maintenance procedures; [16] and (5) failure to ensure adequate water quality standards. As they had done in the Notice Letter, the City referred to the corresponding sections, paragraphs and subparagraphs of the General Permit for each of the categories of violations. See notes 11–14, supra.

Section 1365(b)(1)(A) requires notice of the "alleged violation." The specific content requirements of the notice are set forth in 40 C.F.R. § 135.3(a) which requires plaintiff to identify:

1. sufficient information to permit the recipient to identify the specific standard, limitation or order alleged to have been violated;

2. the activity alleged to constitute a violation;

3. the person or persons responsible for the alleged violation;

4. the location of the alleged violation;

5. the date or dates of such violation;

6. the full name, address and telephone number of the person giving notice.

7. the full name, address and telephone number of the legal counsel, if any, representing the person giving notice.

40 C.F.R. § 135.3(a).

The City's Notice Letter complied with these requirements. First, the Notice Letter gave notice of the alleged violation because it identified five specific categories of standards required under the permit and allegedly violated. Second, the letter's assertion that the SWPPP violated the General Permit is an adequate statement of the activity that constitutes the violation. Third, the letter identifies the Defendants as the "persons responsible for the alleged violation." Fourth, the

**10.** The letter cites the following paragraphs: D.2, D.2.a, D.2.b, D.2.b(1) D.2.b(2), D.2.c, D.2.c(1), D.2.c(2) D.3. and in Appendix F, ¶¶ I.A.6; II. A.2, II.B.1, III.A.1, III.A.2, III.A.3, III.A.4, III.A.5, III.A.6, III.B.1, III.B.2, III.B.3, IV.A.2, IV.A.3, IV.B.1, IV.B.2, IV.B.3, V.A, V.B

**11.** The letter cites the following paragraphs: A, B, B1, B.2.a, B.2.b.C.3, C.4, C.5, C.6 D, E.1, E.4d, E.4f, E.4g, E.6a, E.7.a, E.7.c E.8. ¶ IIID.2.a.

**12.** Appendix D, ¶¶ II., 2d.(1), 2d.(2), 3.A., 3.B., 3.C., 3.C.(2), 3.C.(4), 4.A.(1), 4.A.(2)a., 4.A.(2)c, 4.A.(2)d, 4.A.(2).e, 4.A.(2).f, A.(2).g, 4.A.(2).h, 4.A.(2).i, 4.A.(2).j, 4.A.(2).k, 4.A.(2).1, 4.B.(1)d.vi, 4.B.(1)d.ix, 4.B.(2)a, 4.b.(2)a, 4.B.(2)c.i, 4.B.(2)c.ii, 4.C.(2)a., 4.D.(1)c.

**13.** In particular, the city contends that Defendants' SWPPP violates at least the following provisions of Appendix F of the General Permit regarding the structure and content of their

SWPPP: § I.A.6., III.A.1., III.A.2., III.A.3., III.A.4., III.A.5., IV.A.2., IV.A.3., IV.B.1, IV.B.2., and IV.B.3.

**14.** In particular, the City contends that Defendants' SWPP violates at least the following provisions of Appendix E of the General Permit regarding erosion and sediment controls: §§ A., B., B.1., B.2.a., B.2.b., C.1., C.4., C.5., E.4.d., E.4.f., E.4.g., and E.8. The SWPPP also violates Part III.D.2.b. of the General Permit itself.

**15.** In particular, the City contends that Defendants' SWPPP violates at least the following provisions of Appendix D of the General Permit regarding stormwater management practices: §§ 2.A.(1), 3.A., 4.A.(1), 4.A.(2)f., 4.A.(2)h., 4.A.(2)j., 4.A.(2)k., 4.A.(2)1., 4.B.(1)d.vi., 4.B.(1)d.ix., 4.C.(2)a., 4.D.(1), 4.D.(1)c., 4.D.(2)a., 4.D.(2)c., and 4.D.(2)d.

**16.** In particular, Defendants' SPPP violates III. D.3 of the General Permit.

letter adequately describes the location of the alleged violation because the violations are within the SWPPP itself. Fifth, the letter refers to the SWPPP used in the FWAB hearing, thereby providing adequate notice of the date of the violation. The final two requirements are met because the name, address and telephone number of the City and its Counsel are provided in the letterhead.

Defendants contend that the City's Notice Letter did not meet the first requirement because it failed to describe adequately the alleged violations of the Clean Water Act. In support, they rely heavily on *Public Interest Research Group v. Hercules,* 830 F.Supp. 1525 (D.N.J.1993). There, the Court found that plaintiff's notice letter which alleged sixty-eight specific discharge violations was inadequate because later pleadings filed in the early stages of litigation significantly changed the categories of several violations and added 650 violations to those identified in the letter. *Hercules,* at 1529. The Court found that plaintiff's mere mention of "effluent standard or limitation" in its notice letter was insufficient under 40 C.F.R. § 135.3(a) to put defendant on notice that it also would eventually sue for monitoring, reporting or recordkeeping violations. *Id.* at 1532. The Court reasoned that approving plaintiff's vague notice would frustrate the purpose of the notice requirement, for it would neither permit the EPA to assess intelligently whether to take action nor would it inform the violator of what remedial steps might be required. *Id.* at 1533. Further, while the Court acknowledged that plaintiffs were not aware of many of the violations until well after the Notice Letter had been sent and the complaint had been filed, it noted that nothing "prevented plaintiffs from complying with the Act ... by filing another Notice Letter including those newly discovered violations and then waiting sixty days before filing another Complaint or even an amended Complaint." *Id.*

*Hercules* is inapposite. The City's Notice Letter provided Defendants, the EPA, and the DEC with sufficient notice of the content of the alleged violations. Unlike the notice letter and subsequent pleadings in *Hercules,* the Notice Letter and the complaint in the present suit set forth the same five categories of deficiencies in Defendants' SWPPP (see pp. 17–19, supra). Moreover, unlike the plaintiffs in *Hercules,* the City has not attempted to expand significantly its list of subcategories.

Defendants also contend that the Notice Letter is deficient because it alludes to the SWPPP which was submitted in connection with an administrative hearing in December, 1993 rather than the SWPPP submitted with the Notice of Intent on September 16. The court is not persuaded. The December, 1993 SWPPP was submitted with the Affidavit of Gerhard Schwalbe, the Defendant's engineer. In that affidavit Schwalbe represented that the plans for stormwater controls developed as of December 1993 were to be submitted under the General Permit. Both parties concede that the SWPPP filed in December, 1993 is substantially similar to the one filed in September, 1994. Because we believe that the March 29, 1994 Notice Letter provided Defendants, the EPA and the DEC sufficient notice of the SWPPP violations, we deny Defendants' motion to dismiss for lack of subject matter jurisdiction.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint is denied.

**SO ORDERED.**